UNITED STATES of America, Appellee,

v.

**Fred Anthony FREDERICKSON,
Appellant.**

**No. 79–1148.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1979.

Decided July 17, 1979.

---

Michael H. Irvine, Cedar Rapids, Iowa, argued and on brief, for appellant.

Judith A. Whetstine, Asst. U. S. Atty., Cedar Rapids, Iowa (argued), and James H. Reynolds, U. S. Atty., Cedar Rapids, Iowa, on brief, for appellee.

Before BRIGHT, HENLEY, and McMILLIAN, Circuit Judges.

BRIGHT, Circuit Judge.

Fred Anthony Frederickson appeals from his convictions following a jury trial for, on three occasions (counts I–III), knowingly and willfully making threats to take the life of or to inflict bodily harm upon the President of the United States, in violation of 18 U.S.C. § 871 (1976).[1] On appeal, Frederickson contends (1) the Government presented insufficient evidence to establish that any of Frederickson's statements constituted a "true threat" to inflict harm upon the President of the United States; (2) the trial court erred in admitting evidence of Frederickson's prior convictions of other offenses. We affirm the convictions on counts I and III, but reverse the conviction on count II for reasons set forth in this opinion.

### I. Factual Background.

On October 25, 1978, Frederickson drove into Cedar Rapids, Iowa, to visit his sister, Majorie Decker. Frederickson, age thirty-seven, had travelled from California, where for several years he had led a nomadic-type existence, mostly living alone in a tent. Frederickson's old and battered pickup truck contained substantially all of his worldly possessions.

After a brief visit with Ms. Decker, Frederickson left Cedar Rapids to find a park where he could camp for the night. Shortly after eight o'clock that evening, Frederickson approached the gate of a corn processing plant near Cedar Rapids where Detective Kenneth Millsap of the Cedar Rapids Police Department served, while not on police duty, as security guard. Frederickson parked his truck in front of the plant guardhouse, partially blocking the plant entrance, and engaged Millsap in a conversation concerning, among other things, where Frederickson might camp out for the night. Millsap, then dressed in blue jeans and a sweatshirt, did not at first identify himself to Frederickson as a police officer. Millsap asked Frederickson to move his truck on several occasions, but Frederickson ignored those requests and continued his conversation.

At trial, Officer Millsap testified that Frederickson possessed long hair and wore

---

1. The district court sentenced Frederickson to consecutive terms of five years' imprisonment on counts I and II, for a total of ten years' imprisonment, and to a five-year prison term on count III to run concurrently with the sentences on counts I and II.

a band around his head, torn blue jeans, and a blue shirt. He described Frederickson's conversation as "anti-establishment" in tone and as "violent almost in its entirety." For example, Frederickson mistook the corn processing plant for a power plant and stated, "how easy it would be, a couple well-placed bombs should blow it up." However, Millsap characterized Frederickson's demeanor as "personable, with the exception of [the] subject matter [of his conversation]."

After about ten minutes of sporadic conversation, interrupted at times by truckers checking in with Millsap prior to entering the plant, Millsap asked Frederickson where he was from. Officer Millsap testified at trial:

> He [Frederickson] told me at that time that he was from * * * California * * * and was on his way to Washington to sue the president.
>
> *     *     *     *     *     *
>
> I said—I asked him why he was going to sue the president and he said, "Sue him? I probably wouldn't get any money anyway. I will have to kill him."

Officer Millsap testified that Frederickson's manner in making these statements was "serious, or matter of fact[.]" These statements by Frederickson formed the basis for his conviction on count I of the indictment for making threats against the President's life.[2]

Frederickson briefly continued his violent declarations, maintaining that if he possessed the amount of money the Government spent to keep Charles Manson incarcerated, he (Frederickson) could "kill a lot of pigs."

Because Frederickson would not leave the guardhouse and because his truck had been blocking one lane of the plant entrance, Officer Millsap identified himself as a police officer and stated that he was placing Frederickson under arrest for criminal trespass. Cedar Rapids Police Officers Gerald Chapman and David McKibben responded to Millsap's call for assistance in making the arrest. These officers searched Frederickson and his truck but found no weapons apart from a knife.[3]

Count II of the indictment arises from statements made by Frederickson to Officer Chapman during booking procedures at the Cedar Rapids Police Station.[4] Officer Chapman testified at trial that Frederickson was "very upset" about his arrest, and he related several angry remarks by Frederickson, including that "he [Frederickson] was going to get some pigs," pigs being defined as people connected with law enforcement. During the booking procedure, Frederickson was asked his occupation and replied, "I enjoy sex." In response to a further inquiry as to who employed him, Frederickson initially stated, "Russia, North Korea," then eventually answered the question more seriously. Frederickson also told Officer Chapman, "I am going to ask the Lord to give me you so I can torture you."

Shortly thereafter, with his face only inches from that of Officer Chapman, Frederickson made the following statement giving rise to count II of the indictment:

> Well, as soon as my toys get here I will eliminate all the pigs from the president on down.[5]

Officer Chapman testified that Frederickson made the above statement "[v]ery con-

---

**2.** The indictment phrases this alleged threat slightly differently than the trial testimony:

> I [Frederickson] am from California on my way to Washington, D.C. *to kill or sue* the President . . . Sue, well I probably won't get any money so I will have to kill him. (Emphasis added).

Defense counsel did not cross-examine Officer Millsap as to precisely what Frederickson said, and the testimony quoted in the text constitutes the only evidence of Frederickson's statements pertaining to count I.

**3.** Frederickson, a vegetarian, testified at trial that he used the knife to cut up his vegetables.

The officers also found a single shotgun shell, which Frederickson referred to as his "ring," but no firearms.

**4.** The Cedar Rapids police booked Frederickson on a charge of criminal trespass. Frederickson eventually pled guilty to that charge and received a sentence of one day in jail and a fine of $8.50.

**5.** The reference to "toys" is somewhat obscure. Officer Chapman assumed that in this context

vincingly," but at the time Chapman responded merely by "advis[ing Frederickson] to turn back around and finish being booked."

Following booking, police took Frederickson to the county jail and left him temporarily in the custody of Officer Orville Casteel. Casteel asked Frederickson where he came from, and Frederickson responded that he had come from a desert in California. Frederickson then said, "I used to be a Hells Angel." He added, "I always wanted to blow away a pig." Officer Casteel testified at trial that he was accustomed to hearing that type of statement from arrestees and that he paid little attention to several additional remarks of Frederickson.

Then Frederickson said, "You know, I have an M–79." That remark caught Casteel's attention, for he recognized the term "M–79" as referring to a grenade launcher capable of throwing a projectile some two hundred yards.

Officer Casteel asked Frederickson what he planned to do with the M–79. According to Casteel's trial testimony, Frederickson looked at him, "kind of smiled" and said, "I am going to blow them all up." Casteel, somewhat stunned by the turn of the conversation, inquired, "Who?" Frederickson responded, "I start with the President and go down." Officer Casteel asked, "Would you really do that?" Frederickson replied, "Sure, I would." These statements by Frederickson form the basis for his conviction on Count III.[6]

Despite the violence of Frederickson's language, he did not display any physical aggressiveness towards anyone during the events described above. In a subsequent interview with a Secret Service agent, and again at trial, Frederickson denied possessing any intention to physically harm the President or anyone else. He admitted at trial, however, that he "might have said all those words" alleged to be threats.

On cross-examination, Frederickson admitted that he had been in Washington, D.C., ten or fifteen times, that he had been in the White House twice, and that he had climbed over the White House fence during a civil·disobedience demonstration a few years previously.

## II. Sufficiency of the Evidence.

The record contains ample evidence to support jury findings that Frederickson made statements corresponding to the three counts of the indictment substantially as set forth above. The issue here is whether the record, taken as a whole, permits a conclusion that each of those statements amounted to a "threat" falling within 18 U.S.C. § 871. In resolving that issue, we must view the evidence in the light most favorable to the jury's verdict. *See Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

18 U.S.C. § 871 provides in relevant part:

(a) Whoever knowingly and willfully deposits for conveyance * * * any letter * * * containing any threat to take the life of or to inflict bodily harm upon the President of the United States * * * or *knowingly and willfully* otherwise makes any such threat against the President * * * shall be fined not more than $1,000 or imprisoned not more than five years, or both. (Emphasis added).

■ The courts have disagreed as to the proper construction of the willfulness requirement of section 871,[7] and the Supreme

---

"toys" meant weapons. Frederickson and his sister testified that his mention of toys referred to various musical instruments that he could play, such as guitar, harmonica, and the like.

**6.** Count III of the indictment charges Frederickson with orally threatening to take the life, or to inflict bodily harm upon the President of the United States by use of the following language:

. . . always wanted to blow away a pig . . . blow them all up . . . . Start with the President and go down.

Frederickson did not question whether this language of the indictment states an offense under 18 U.S.C. § 871.

**7.** *Compare Roy v. United States*, 416 F.2d 874, 877–78 (9th Cir. 1969) (threatening statement is willful if a reasonable person should foresee that the hearers would take the statement seriously), and *United States v. Hart*, 457 F.2d 1087, 1090–91 (10th Cir.), *cert. denied*, 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972) (same), *with United States v. Patillo*, 431 F.2d 293 (4th Cir. 1970), *panel opinion adhered to*, 438 F.2d

Court has not yet resolved that controversy.[8] Here the district court, in its instructions to the jury, adopted the construction of section 871 enunciated by Mr. Justice Marshall in his concurring opinion in *Rogers v. United States*, 422 U.S. 35, 41–48, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). As no objection was made to those instructions, the *Rogers* view of the statute constitutes the law of this case, against which we measure the sufficiency of the evidence.

Thus, for the purposes of this case, to obtain a conviction under section 871 the Government was required to establish

> that the defendant appreciated the threatening nature of his statement and intended at least to convey the impression that the threat was a serious one. [*Rogers v. United States, supra,* 422 U.S. at 46, 95 S.Ct. at 2098 (Marshall, J., concurring).]

The proof of such intention must turn upon the circumstances under which the statement was made. *Id.* at 48, 95 S.Ct. 2091.

In addition, in determining whether statements constituted a "threat" within the meaning of section 871, the court must keep the commands of the first amendment clearly in mind so as to distinguish constitutionally protected speech from a true "threat." *Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). In *Watts*, the defendant stated, in the context of a political rally against the draft, " 'If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.' " *Id.* at 706, 89 S.Ct. at 1401. The Court reversed Watts' conviction under section 871 and said:

> We do not believe that the kind of political hyperbole indulged in by petitioner [defendant Watts] fits within that statutory term. For we must interpret the

language Congress chose "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). * * * We agree with petitioner that his only offense here was "a kind of very crude offensive method of stating a political opposition to the President." Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise. [*Watts v. United States, supra,* 394 U.S. at 708, 89 S.Ct. at 1401–1402.]

Applying these standards, we reject Frederickson's attack on the sufficiency of the evidence underlying counts I and III, but agree with his assertion that the Government failed to prove a serious threat under count II. We discuss each count in sequence.

Frederickson's statements at issue in count I, *see* p. 1361 *supra,* contain the unequivocal language, "I will have to kill him," referring to the President. The Government presented evidence that Frederickson spoke those words seriously, deliberately, and neither in jest nor in response to a particular provocation. Frederickson's express recognition of the unlikelihood of succeeding in his lawsuit serves to highlight the threatening language and to dispel any implication that the threat is contingent upon failure of the lawsuit. *See United States v. Moncrief*, 462 F.2d 762 (9th Cir. 1972). In our judgment, the Government

---

13 (4th Cir. 1971) (*en banc*) (threat against President violates statute only if speaker either possesses actual intention to carry it out or communicates it in a manner tending "to have a restrictive effect upon the free exercise of Presidential responsibilities[.]" 438 F.2d at 15.) *See Watts v. United States*, 394 U.S. 705, 707–08, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (expressing "grave doubts" about lower courts' prior interpretations of the willfulness requirement of § 871).

8. In *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), the Court faced a claim that the district court had erred in giving an "objective" willfulness instruction to the jury in a prosecution brought under § 871— *i. e.*, a threat is willfully made if a reasonable person would foresee its reception as a serious threat. The *Rogers* majority, however, reversed Rogers' conviction on other grounds.

**1364**

presented sufficient evidence to permit a jury to find that, taken in context, this statement of Frederickson amounted to a serious threat.

■ The statement underlying count II, see p. 1361 supra, stands on a different footing. The record discloses that Frederickson made that statement while upset about his arrest, during which police officers had handled him somewhat roughly, and in a manner plainly displaying his anger towards one of the arresting officers. Frederickson contemporaneously made several other remarks, some containing threats of a bizarre nature, and others representing unconventional or rebellious responses to police questioning, that could not reasonably be taken seriously in the circumstances. Although Officer Chapman testified that Frederickson's manner in making these statements was serious, his reaction at the time was merely to advise Frederickson "to turn back around and finish being booked" and does not indicate any concern about the alleged threats. Moreover, the sweeping coverage of the statement in question, referring to "all the pigs from the President on down," undermines any inference that Frederickson intended his words as a threat against the President personally. In this context, Frederickson's reference to the President served only to illustrate the dimensions of the class at which he directed his antagonism.

In sum, taken in context, the statement of Frederickson giving rise to count II of the indictment unmistakably represents no more than a crude method of expressing antagonism towards the arresting officers and law enforcement figures generally. Such speech does not constitute a serious threat against the President falling within section 871.

■ The language at issue in count III, see p. 1362 supra, displays substantially more specificity than that of count II when evaluated in the context of the conversation between Frederickson and Officer Casteel concerning the grenade launcher. Frederickson had indicated an intention to use the weapon to "blow them all up." In response to Casteel's direct question, "Who?" Freder-

ickson said, "I start with the President and go down." That language seems to single out the President as the initial object of Frederickson's violent plan.

Frederickson spoke these apparently threatening words in circumstances materially different from those pertinent to count II. Here, Frederickson, outwardly calm, volunteered a scheme of assassination utilizing a specific weapon and commencing with a particular individual, the President, who could be found in the place that was Frederickson's announced destination, Washington, D.C. In light of the evidence produced by the Government and the admissions made by the defendant in his direct testimony and on cross-examination, we cannot say as a matter of law that the language in question did not convey an avowed present determination to injure the President of the United States.

Frederickson, relying on Watts v. United States, supra, argues that his statements underlying the three counts amounted only to crude and unpleasant expressions of his political opposition to the "establishment" in general, as symbolized by the presidency. However, those statements did not occur in the context of a political discussion as in Watts. In light of all the circumstances, we cannot say the district court erred in submitting to the jury the question of whether Frederickson's statements in counts I and III constituted political hyperbole, idle talk, or serious threats.

### III. Evidence of Other Crimes.

The Government introduced at trial, as evidence of Frederickson's intent in making the allegedly threatening statements, the following prior convictions of Frederickson: (1) a 1973 misdemeanor conviction in Florida for trespassing and disorderly conduct by making threats of violence; and (2) a 1978 California conviction, upon a plea of nolo contendere, for making a false bomb threat. Frederickson contends that the admission into evidence of these prior convictions was erroneous and entitles him to a new trial on the remaining counts of the indictment. We disagree.

■ The admissibility of other crimes evidence is governed by Fed.R.Evid. 404(b), which provides:

> (b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Our cases reveal certain requirements which must be met for other crimes evidence to be admissible under the rule: (1) a material issue on which other crimes evidence may be admissible has been raised, *e. g., United States v. Drury,* 582 F.2d 1181, 1184 (8th Cir. 1978); *United States v. Maestas,* 554 F.2d 834, 837 (8th Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977); (2) the proffered evidence is relevant to that issue, *ibid.*; (3) the evidence of the other crimes is clear and convincing, *e. g., United States v. Cobb,* 588 F.2d 607, 612 (8th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *United States v. Drury, supra,* 582 F.2d at 1184; *United States v. Davis,* 551 F.2d 233, 234 (8th Cir.), *cert. denied,* 431 U.S. 923, 97 S.Ct. 2197, 53 L.Ed.2d 237 (1977). In addition, to be admissible on such issues as intent, knowledge, or plan, the other crimes evidence must relate to wrongdoing "similar in kind and reasonably close in time to the charge at trial." *United States v. Drury, supra,* 582 F.2d at 1184. *See, e.g., United States v. Little,* 562 F.2d 578, 581 (8th Cir. 1977); *United States v. Jardan,* 552 F.2d 216, 219 (8th Cir.), *cert. denied,* 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977). Finally, evidence otherwise admissible under Rule 404(b) may be excluded under Fed.R.Evid. 403, "if its probative value is substantially outweighed by the danger of unfair prejudice * * *."[9]

■ Here, Frederickson's knowledge and intent in making the allegedly threatening statements represents a material issue. Frederickson's prior convictions of offenses which included the element of making threats, and required proof of an intent similar to that required for the crime charged, are relevant on that issue. The clarity of the evidence of these convictions is unquestioned.[10] Both prior offenses seem similar in kind and reasonably close in time to the charge at trial. Giving due deference to the district judge who saw and heard the evidence, *United States v. Maestas, supra,* 554 F.2d at 836, we cannot say that the court abused its discretion in determining that the prejudicial impact of these prior convictions did not substantially outweigh their probative value.[11] Therefore, we reject Frederickson's contention that the use of his prior convictions entitles him to a retrial.

---

9. In *United States v. Clemons,* 503 F.2d 486 (8th Cir. 1974), prior to the adoption of the Federal Rules of Evidence (which became effective July 1, 1975), this court set out the above tests governing the admissibility of other crimes evidence and held, in addition, that such evidence might be admitted only upon a finding that "the probative worth [of the evidence] outweighs the probable prejudicial impact." *United States v. Clemons, supra,* 503 F.2d at 489. Fed.R.Evid. 403 apparently has replaced that latter rule. *See United States v. Maestas, supra,* 554 F.2d at 836–37 n.2. However, the cases cited in the text demonstrate that, apart from this change effected by Rule 403, the *Clemons* tests for admissibility of other crimes evidence have survived the adoption of the Rules of Evidence. *See United States v. Drury, supra,* 582 F.2d at 1184 n.6.

10. Frederickson does, however, challenge the use of his 1978 conviction for making a false bomb threat in California on the ground that it was based upon a plea of *nolo contendere.* We see no reason, for the purposes of admissibility under Fed.R.Evid. 404, to distinguish between a judgment of conviction based on a plea of *nolo contendere* and a judgment of conviction obtained in any other manner comporting with due process. It is well-settled that a plea of *nolo contendere* constitutes an admission of "every essential element of the offense [that is] well pleaded in the charge." *Lott v. United States,* 367 U.S. 421, 426, 81 S.Ct. 1563, 1567, 6 L.Ed.2d 940 (1961); *United States v. Lair,* 195 F. 47, 52 (8th Cir. 1912).

11. The admissibility of Frederickson's 1973 Florida misdemeanor conviction, on which he received a sentence of only a small fine, presents a close question under the standard of Fed.R.Evid. 403. We hold only that no abuse of discretion occurred in the circumstances presented in this case.

## IV. *Summary.*

Accordingly, we affirm the convictions on counts I and III but reverse the conviction on count II.

The partial affirmance leaves Frederickson with two *concurrent* five-year sentences of imprisonment. The district court imposed consecutive sentences on counts I and II, but stipulated that the sentence on count III was to run concurrently with "the sentence on count [I] and the sentence on count [II]." Because we have set aside the conviction on count II, the sentence on count III will now run concurrently with that on count I.[12]

12. Frederickson personally has written a somewhat appealing letter to this court, stating that he intended to kill no one and, indeed, is a very peaceful person only wishing to stand up for his own rights and to sue the Government for harassment against him. He claims that he is a person of peace, a nonmeateater, and that he is not crazy. The letter is not part of the record on appeal. We refer it to the district court for such consideration as may be appropriate.