**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Michael WELCH, Defendant-Appellant.**

No. 82–1923.

United States Court of Appeals, Tenth Circuit.

Oct. 12, 1984.

Vicki Mandell-King, Asst. Federal Public Defender, Denver, Colo. (Michael G. Katz, Federal Public Defender, Denver, Colo., was also on brief), for defendant-appellant.

Bruce F. Black, Asst. U.S. Atty., Denver, Colo. (Robert N. Miller, U.S. Atty., and C. Phillip Miller, Asst. U.S. Atty., Denver, Colo., were also on brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, BREITENSTEIN and SEYMOUR, Circuit Judges.

HOLLOWAY, Chief Judge.

Defendant, James Michael Welch, timely appeals his conviction, on a jury verdict, of violation of 18 U.S.C. § 871,[1] a threat to take the life of or to inflict bodily harm upon the President of the United States.[2] Defendant was charged with knowingly and willfully making a threat to take the life of and to inflict bodily harm upon the President of the United States, on or about December 30, 1981, in the State and District of Colorado, in violation of Title 18, United States Code, Section 871. Defendant contends that the evidence was insufficient to support his conviction and that the trial judge's behavior toward defense witnesses and defense counsel deprived him of a fair trial. We disagree and affirm the judgment and sentence.

I

After the verdict of guilty, on appeal we must consider the evidence in the light most favorable to the Government. Considered in that light it tends to show the following:

On December 28, 1981, Welch made an appointment with personnel at the Southwest Denver Mental Health Center in Denver, Colorado, and on December 29 he arrived at the Center for his appointment. II R. 76. Welch had recently lost his job, had been unable to obtain vocational training due to cuts in the programs, had been unable to consult with his private doctors who were out of town, had had his medication discontinued, and had become discouraged about his situation. III R. 248–50. Welch had been diagnosed as having minimal brain dysfunction. III R. 247. During an interview at the Center Welch blamed President Reagan for the unavailability of vocational training and stated that if it were up to him, he would do a better

---

1. 18 U.S.C. § 871 (1976) states in pertinent part:

 § 871. Threats against President and successors to the Presidency

 (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. James Michael Welch received a two year sentence. I R. 30.

job than Hinckley had done. II R. 78, 127. He also stated that if Reagan were in town he would get a rifle and shoot him. II R. 129, 154. Welch was warned that his threats would be reported to the Secret Service. II R. 88, 131. After the warning Welch reiterated his threats. II R. 132–33. Center personnel contacted the Secret Service. II R. 177–78.

After leaving the Center Welch took a large amount of medication and passed out at his wife's residence. III R. 255. Secret Service Agents Lloyd Bulman and John Bay went to her residence at about 6 p.m. on December 30, after Welch had awakened. II R. 178–79, 190. As they parked in front of the house and got out of their car, they saw Welch come out the front door, walk to a Volkswagen parked in the driveway and get in. II R. 167, 190–91. As they approached the car, he locked the doors. He rolled the window down a few inches and they identified themselves as Special Agents of the Secret Service and asked him to exit the vehicle, go back into the house and talk with them. *Id.* He refused. II R. 169.

During the conversation with the Agents on December 30 Welch stated, "If Reagan was here, I would shoot him. I wouldn't make the same mistake as Hinckley did. I would kill him. I would shoot him." II R. 170; to similar effect see also II R. 193. Mr. Bulman, Special Agent for the Secret Service, said that Welch "made the threat again, 'I will kill Reagan.' " II R. 170. During the conversation the Secret Service Agents observed Welch eat a handful of pills. Becoming increasingly agitated, Welch started his car, drove across the neighbor's yard and sped away. Welch was arrested at about 7 a.m. the next day at his parents' residence. II R. 182, 196.

The Government's witness, Dr. May, a physician-psychiatrist and then director of the Southwest Denver Mental Health Center, testified concerning Welch's condition at the time he made threatening statements on December 29 at the Center:

Q And with minimal brain dysfunction, doesn't that affect a person's judgment? Doesn't that go hand-in-hand with that impulsivity?

A Yes, they would tend to be more—as children, they tend to be more impulsive, that's true.

Q And being impulsive, that reflects on a person's judgment, does it not?

A It can.

Q Okay, and so that while you have testified Mr. Welch may have known what words he used, he may have not been using judgment in using those words, or he may not have perceived how other people would take them, would that be correct?

A Yes, that's correct, in the sense that I think he showed poor judgment on that particular day. Whether or not he was fully aware of the implications of that, I felt he was. I think he was very angry and agitated. I would be hard-pressed to think that was an extension of a minimal brain dysfunction.

Q But it could be, could it not?

A It is conceivable, but not likely, in my estimation.

Q Again, at that point, like you said yourself, you didn't have an opportunity to be able to evaluate whether he had?

A That's correct. I thought plenty of the other things that happened in his life that might have set this off, other than just the minimal brain dysfunction.

Q But the other things that happened in his life in part may be attributable to the handicap that he has, is that correct?

A Maybe. I don't feel it is likely to that degree.

Q Again, you were not completely familiar with the background and you yourself said—

A Correct.

Q You yourself said you haven't had time to evaluate him fully?

A That's right, more history certainly would have helped.

II R. 121–23; see also II R. 104, 106. Dr. May also testified that he thought Welch "was in condition to understand what he was saying and the meaning of what he

was saying." II R. 106. Dr. May further testified that the staff of the Health Center did not have enough information to make a diagnosis. II R. 103.

Susan Meikle, a clinical psychologist with a master's degree who worked at the Center, testified that she saw Welch on December 29. Welch made the comment that he would "do a better job than Hinkley did." Meikle felt Welch was aware of what he said. With respect to his mental capacity, she said Welch was "capable and aware." II R. 78, 81.

The Secret Service Agents testified concerning Welch's condition at the time he made statements on December 30, the day after the incident at the Southwest Denver Mental Health Center. Agent Bulman testified that it appeared to him that Mr. Welch was extremely irate at the President and could be capable of carrying out the threats. Bulman also said that as to Welch's mental condition, he felt Welch was lucid and knew what he was saying. Welch was yelling or screaming at several points. Bulman said he believed the threats were made before Welch began eating any of the pills he had in his hand. II R. 176–77. Agent Bay also testified about Welch's mental condition at the time of the conversation with him on December 30. He said Welch did not slur his words and spoke in complete sentences. II R. 197.

The defense was based in part on proof of Welch's attention deficit disorder, which Dr. Roberts, a board certified psychiatrist, described. He said the symptoms of this disorder include lack of impulse control, poor judgment and hyper-activity. Dr. Roberts had two diagnoses of Welch: attention deficit disorder, residual type, and explosive personality disorder. III R. 277. Dr. Roberts said Welch's ability to perceive the impact of his words was diminished by his two disorders, III R. 284, and that his disorders prevented him from refraining from making such damaging statements. III R. 316. Further Dr. Roberts testified that Welch's ingestion of drugs before his talk with the Secret Service Agents "caused his ability to—to be rational and exercise good judgment and considered mental state would be very much adversely affected by those drugs." III R. 288. The doctor's opinion was that the effect of the drugs and Welch's attention deficit disorder was such that he may have known in a grammatical sense the words he was saying, but he didn't know what he was saying from the standpoint of its context, and Welch was not then able to control what he was saying. III R. 290.

Dr. Muller, another psychiatrist, testified about the reports of Welch's condition when he went to the Southwest Denver Mental Health Center on December 29: Welch then was very depressed and suicidal. III R. 322. From his interviews with Welch and the records, Dr. Muller diagnosed Welch as suffering from attention deficit disorder, with hyperactivity, and he has slight brain damage which is an organic problem. *Id.* at 319, 332. Dr. Muller said that Welch's awareness of the context of his words and his judgment in uttering them were terribly flawed and that Welch's ability to form a specific intent about his statements and conduct was definitely impaired. III R. 325–26. Dr. Muller also said that the quantity of other drugs ingested by Welch, combined with the lack of amphetamine medication needed daily by Welch, further impaired his ability to form a specific intent concerning the threats made during the conversations with the Secret Service Agents. *Id.* at 326–28.

## II

Welch says that the evidence was insufficient to support his conviction because he made the statements in a political context, he stated them in conditional terms, the context in which he uttered his statements indicates the lack of a true threat, and he lacked the ability to form the specific intent that his statements be taken seriously.

On this appeal from a guilty verdict we must view all the evidence, direct and circumstantial, together with all reasonable inferences therefrom, in the light most favorable to the Government. *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir.

1972). Welch contends, however, that he made his statements in the course of expressing the effect of budget cuts on his life and was commenting on administration policies; thus he was using "a kind of very crude offensive method of stating a political opposition to the President."

■ In *Watts v. United States*, 394 U.S. 705, 706, 89 S.Ct. 1399, 1400, 22 L.Ed.2d 664 (1969) (per curiam), petitioner remarked in a small discussion group at a public rally on the Washington Monument grounds that if he were inducted into the Army and made to carry a rifle, "the first man I want to get in my sights is L.B.J." Both petitioner and the crowd laughed after the statement was made. *Id.* at 707, 89 S.Ct. at 1401. The Supreme Court stated:

> We agree with petitioner that his only offense here was "a kind of very crude offensive method of stating a political opposition to the President." Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise.

*Id.* at 708, 89 S.Ct. at 1402. *Watts* is distinguishable. Here Welch's statements to the Secret Service Agents were not made at a political rally or political meeting or during a political discussion. We, therefore, cannot conclude that Welch was merely stating political opposition to the President.[3]

■ Welch says that his statements were made in a conditional form and, citing *Watts*, he argues that they were not violative of the statute. Even though one of Welch's threats may have been conditional, Secret Service Agent Bulman testified that Welch also said "I will kill Reagan." II R. 170. We are satisfied that the evidence was sufficient to support the conviction, despite the fact that at several points the statements were conditional.

Welch argues that the circumstances surrounding his threat, the lack of evidence

that the President would be coming to Denver, or that Welch possessed the wherewithal to carry out his threat, all indicate the lack of a true threat and show simply that Welch was antagonistic toward the Secret Service Agents who he thought had come to arrest him. In *United States v. Dysart*, 705 F.2d 1247 (10th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 339, 78 L.Ed.2d 307 (1983), we said that 18 U.S.C. § 871

> requires that the Government must prove a "true 'threat,'" *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664, and the instructions given by the trial court met this requirement (I R. 39 & 42):
>
>> In a prosecution for threats against the President, it is not necessary to show that the defendant intended to carry out the threat, nor is it necessary to prove that the defendant actually had the apparent ability to carry out the threat.
>>
>> The question is whether those who hear or read the threat reasonably consider that an actual threat has been made. It is the making of the threat, not the intention to carry it out, that violates the law.

*Id.* at 1256. The Secret Service Agents told Welch that all they wanted to do at that time was to talk to him and they did not tell him he was under arrest. II R. 169, 193. Welch cannot say his statements were "no more than a crude method of expressing antagonism towards the arresting officers and law enforcement figures generally," as was the case in *United States v. Frederickson*, 601 F.2d 1358, 1364 (8th Cir.), *cert. denied*, 444 U.S. 934, 100 S.Ct. 281, 62 L.Ed.2d 193 (1979). Thus the evidence was sufficient to show a "true threat" within the prohibitions of § 871.

■ Welch contends that the proper test under the instructions is whether he possessed the ability to form the specific intent that his statements be taken seriously, not whether persons hearing the statements took them seriously. He says that

3. We note that in *United States v. Callahan*, 702 F.2d 964, 966 (11th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), the fact that a letter threatening the lives of the

President-elect and Vice-President-elect of the United States contained certain political and religious statements did not serve to remove it from the prohibition of the statute.

due to his brain dysfunction and the medication he took before and during the interview with the Secret Service Agents, he lacked the ability to form this specific intent. The charge given by the trial court adequately covered Welch's theory of defense.[4] Among all the evidence presented, there was lay testimony by Agent Bulman that Welch appeared to be angry but that he was lucid; that he appeared to be coherent; that he appeared to know what he was saying and appeared to understand the words he was using; and that he was under no duress when talking with the Secret Service Agents. II R. 174–76. We have outlined the main portions of the evidence on this issue above in Parts I and II. The issue is disturbing, but considering the evidence in the light most favorable to the Government as we must at this point, we are satisfied that it is sufficient to support the jury's finding against the defendant on the issue.

In addition, we recognize that courts have disagreed as to the proper construction of the willfulness requirement of § 871,[5] and the Supreme Court has not yet resolved that controversy.[6] *Frederickson*, 601 F.2d at 1362–63. In *Frederickson*, the

court found that the construction of § 871 enunciated by Mr. Justice Marshall in his concurring opinion in *Rogers v. United States*, 422 U.S. 35, 41–48, 95 S.Ct. 2091, 2095–99, 45 L.Ed.2d 1 (1975), constituted the law of the case and that the Government, in order to obtain a conviction, must establish

> that the defendant appreciated the threatening nature of his statement and intended at least to convey the impression that the threat was a serious one. [*Rogers v. United States, supra*, 422 U.S. at 46, 95 S.Ct. at 2098 (Marshall, J., concurring).]

*Frederickson*, 601 F.2d at 1363. "The proof of such intention must turn upon the circumstances under which the statement was made." *Id.* In *United States v. Hart*, 457 F.2d 1087, 1090 (10th Cir.), *cert. denied*, 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972), we approved an instruction stating that before a defendant can be convicted under this statute the jury

> *must be convinced beyond a reasonable doubt that the defendant intentionally made a statement, either written or oral, in a context and under such circumstances that a reasonable person*

---

**4.** The relevant portion of the jury instructions was as follows:

> Now, the theory of the defense in this case has been presented through evidence that the defendant acted or failed to act as the result of his mental disability of minimal brain dysfunction, the lack of proper medication and ingestion of a quantity of other drugs, if any.
>
> That evidence is to be considered in determining whether or not the defendant acted or failed to act with specific intent as charged, and if the evidence in the case leaves the jury with a reasonable doubt whether because of the defendant's mental disability, minimal brain dysfunction, lack of proper medication and ingestion of other drugs, if any, or if the mind, rather, of the accused was capable of forming or did form specific intent to commit the crime charged, then the jury should acquit the accused.

III R. 347–48.

**5.** *Compare Roy v. United States*, 416 F.2d 874, 877–78 (9th Cir.1969) (threatening statement is willful if a reasonable person should foresee that the hearers would take the statement seriously), and *United States v. Hart*, 457 F.2d 1087, 1090–91 (10th Cir.), *cert. denied*, 409

U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972) (same), with *United States v. Patillo*, 431 F.2d 293 (4th Cir.1970), *panel opinion adhered to*, 438 F.2d 13 (4th Cir.1971) (*en banc*) (threat against the President violates statute only if speaker either possesses actual intention to carry it out or communicates it in a manner tending "to have a restrictive effect upon the free exercise of Presidential responsibilities[.]" 438 F.2d at 15.) *See Watts v. United States*, 394 U.S. 705, 707–08, 89 S.Ct. 1399 [1401–02], 22 L.Ed.2d 664 (1969) (expressing "grave doubts" about lower courts' prior interpretations of the willfulness requirement of § 871).

*Frederickson*, 601 F.2d at 1362–63 n. 7.

**6.** In *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), the Court faced a claim that the district court had erred in giving an "objective" willfulness instruction to the jury in a prosecution brought under § 871—*i.e.*, a threat is willfully made if a reasonable person would foresee its reception as a serious threat. The *Rogers* majority, however, reversed Rogers' conviction on other grounds.

*Frederickson*, 601 F.2d at 1363 n. 8.

*would foresee that the statement would be interpreted by persons hearing or reading it as a serious expression of an intention to inflict bodily harm upon or to take the life of the President of the United States ...* (emphasis in original).

Applying this construction of § 871, we conclude that the evidence was sufficient here for the jury to find that a reasonable person would foresee that the statement would be interpreted by persons hearing it "as a serious expression of an intention to inflict bodily harm upon or to take the life of the President of the United States." *Id.* We therefore conclude that the record contains sufficient evidence to support the verdict.

## III

■ Welch further contends that the trial judge's behavior toward defense witnesses and defense counsel deprived him of a fair trial. He says that the trial judge's words and attitude toward defense witnesses Dr. Roberts and Dr. Muller and defense counsel completely undermined the credibility of those individuals and unfairly destroyed the defense case.

A charge of misconduct by a trial judge "should not be lightly made and once made, should not be casually treated by a reviewing court." *United States v. Cardall,* 550 F.2d 604, 606 (10th Cir.1976), *cert. denied,* 434 U.S. 841, 98 S.Ct. 137, 54 L.Ed.2d 105 (1977). We have considered the portions of the record cited in the appellate brief containing the district court's comments.[7] We are mindful that

[a] trial judge has both great responsibility and discretion in conducting the trial of a case. He should be the exemplar of

---

**7.** One of the portions of the record cited by the appellant is as follows:

Q My question, Doctor, was that if you were told that in that context, he had made a threat on the life of the President how—in your opinion, what would that—why would he have made such a threat in the course of vening (sic) frustration?

A I think he was feeling very powerless. He needed to be heard. He needed some attention. He needed to feel like he had—like somebody was taking him seriously. The context that he was describing was one in which he is not being taken seriously. He is not being treated like a human being.

THE COURT: Just a moment. That will be stricken. That statement of the doctor will be stricken from the record and you are instructed to disregard it.

Now, be responsive, Doctor. You have testified here that you have testified on previous occasions, and I presume that as a well-educated man, you know what "responsive" means.

We will proceed.

III R. 324. Another of the portions of the record cited by the appellant is as follows:

A Could you restate that?

Q Yes, I'm sorry. Could you give your opinion then as to the combined effects of no Dexedrine, attention deficit disorder, and some quantity of drugs on Mr. Welch's ability to intend that a threat be taken seriously?

A Yes, all of those factors would considerably worsen an attention deficit disorder. It will therefore give rise to more impulsivity, poorer judgment, more hyperactivity, the whole constellation of symptoms. They would be exaggerated and therefore diminish his ability to form specific intent about the threat on the life of the President.

In addition, I think—if I may add, the words of the law, and I don't know, it would be excessive to answer—

MR. BLACK: Your Honor, I'm going to object at this time, if the doctor is going to testify about the law.

THE COURT: Yes, that's my expertise, not yours, Doctor. You stay with psychiatry.

THE WITNESS: May I say something?

THE COURT: You will not—you will just answer questions, and do you understand that?

THE WITNESS: Yes, I do.

THE COURT: All right.

MS. MANDELL–KING: Thank you very much, Dr. Muller. I think that the way you answered the last—

THE COURT: Now, just a moment. You will make no further comments regarding what the Court has ruled on in this particular instance, young lady.

MS. MANDELL–KING: Your Honor, I wasn't—

THE COURT: Don't argue back.

MS. MANDELL–KING: Yes, Your Honor.

THE COURT: You are a lawyer and you must act like one.

MS. MANDELL–KING: Yes, Your Honor. Dr. Muller, I thank you, and I have no further questions.

THE COURT: All right.

MS. MANDELL–KING: At this time.

THE COURT: Cross-examination?

III R. 328–29.

dignity and impartiality. He must exercise restraint over his conduct and statements in order to maintain an atmosphere of impartiality.

*United States v. Bray,* 546 F.2d 851, 859 (10th Cir.1976). Although the court's comments were brusk and disturbing to counsel, we are convinced that, considering the entire trial, the matters mentioned were but minor incidents which did not affect the substantial rights of the defendant. *United States v. Stoddart,* 574 F.2d 1050, 1054 (10th Cir.1978). *See also United States v. Cardall,* 550 F.2d at 604; *Cooper v. United States,* 403 F.2d 71 (10th Cir.1968).

AFFIRMED.