hVICTORY, J.*
RT, a fifteen-year-old high school student, was arrested on April 25, 1999 and charged as a juvenile with one count of terrorizing in violation of La. R.S. 14:40.1(A) and one count of conveying a false bomb threat in violation of La. R.S. 14:54.1(A). He remained in custody until his trial on June 30, 1999. A dispositional hearing was subsequently held on July 28, 1999. At the conclusion of that hearing, RT was adjudicated a delinquent and sentenced to serve one year in the custody of the Department of Corrections on each count, sentences to run concurrently.
RT appealed his adjudication as a delinquent, asserting that the statutes in question were unconstitutionally vague and overbroad and that there was insufficient evidence presented by the state to support his adjudication. The court of appeal rejected the attack on the constitutionality of the statutes but found that there was insufficient evidence to support the delinquency adjudication based on either of I ?the offenses charged. It reversed the trial court’s adjudication.[1] We granted the *1241 state’s application for certiorari to review the correctness of that decision.[2]
The issue before us is whether the state presented sufficient evidence to support RT’s adjudication as a delinquent for violation of the offenses charged.
In a delinquency proceeding, in order to sustain its burden of presenting sufficient evidence to sustain a conviction, the state must prove beyond a reasonable doubt that the child committed every element of the offense charged. La. Ch. C. art. 883; State v. S.B., 31,264 (La.App.2d Cir.9/25/98), 719 So.2d 1121. Just as in a proceeding against an adult, the constitutional standard for evaluating the sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find that the state proved all of the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
BACKGROUND FACTS
The events leading up to prosecution of this case occurred just a few days after the Columbine school shooting in Littleton, Colorado, in which two high school students set off bombs at their school and then held twelve of their fellow students hostage before murdering them and committing suicide. It is undisputed that the defendant in this case, as well as his closest friends, were singled out as the most likely to commit such an offense at their own high school, largely because they seemed different from the rest of the student body. They made a habit of wearing 13blaek clothing and they listened to what RT himself characterized as “homicidal” and “satanic” lyrics of heavy metal bands. In addition, RT had a prior delinquency adjudication and rumors had circulated after an Arkansas school shooting, months before the Columbine incident, that he was in possession of a “hit list.”
After watching the extensive media coverage of the Columbine incident on television, RT predicted that the student body would be pointing at him and he recognized that others would think he fit a “stereotype.” He recounted that at school the day afterward, “Everywhere I turned people were asking me if I was going to blow up the school.” In this climate of fear, RT made certain statements which the state charged as violations of specific criminal statutes.
CHARGE OF VIOLATION OF LA. R.S. 14:40.1(A)
La. R.S. 14:40.1(A) provides:
A. Terrorizing is the intentional communication of information, known by the offender to be false, that the commission of a crime of violence is imminent or in progress or that a circumstance dangerous to human life exists or is about to exist, thereby causing any person to be in sustained fear for his or another person’s safety; causing evacuation of a building, a public structure, or a facility of transportation; or causing other serious disruption to the public.
The state presented the testimony of only one witness to substantiate this charge. CM, a fellow biology student, testified that she had an “off-hand” conversation with RT during biology class. In that conversation he told her “how it would be really easy to have a shooting” in the biology class. He then described a scenario of how he could carry out a shooting with the help of others by blockading *1242 doors and windows and then shooting those he did not like, while skipping over his 14friends. He also remarked at another point in the conversation that it would be easy to carry out such a shooting when students were together for graduation, ring ceremonies, or group days. When the prosecutor asked if the statement caused her to be afraid, the witness answered that “... I just didn’t really know what to think. I just kind of didn’t think much about it.” Under cross-examination the witness clarified that RT never said he actually planned to carry out this scenario. He just explained what could be done. The conversation ended when the teacher spotted them talking during class.
The state produced no evidence that the witness seemed alarmed or that she reported the conversation in question to anyone. She remained in class, seated next to RT, and attended school the next day. She missed a few days of school after the conversation, but explained that her mother pulled her out of school in fear for her safety in the aftermath of the Columbine tragedy. The state presented no evidence that the witness ever repeated this conversation to her mother or anyone else prior to RT’s arrest or that her absence from school was a result of anything that RT had done or said.
We agree with the court of appeal that the state did not present sufficient evidence to support an adjudication of delinquency for violation of La. R.S. 14:40.1(A). There was no evacuation of any building, public structure, or facility of transportation. There is no evidence that the conversation was repeated by this witness or overheard by anyone else. Therefore, there is no evidence that any statements made to this witness by RT could have caused any public disruption or could have caused fear in any person other than CM.
The only portion of the statute that RT could possibly have violated is |Bthe section that prohibits the intentional communication of false information that a crime of violence is imminent or in progress, or that a circumstance dangerous to human life exists or is about to exist, thereby causing any person to be in sustained fear for his or another person’s safety. However, the state presented no evidence that information was conveyed to the effect that a crime of violence was in progress or imminent, or that a circumstance dangerous to human life existed or was about to exist. The description of the conversation, taken as a whole, is more suggestive of a discussion of hypothetical conduct. Moreover, causation of “sustained fear” is clearly an essential element of this part of the statute. Both the direct testimony and conduct of CM refute any contention that the conversation caused her any “sustained fear.” Even viewing the evidence in the light most favorable to the prosecution, and without taking RT’s exculpatory testimony into consideration, the state did not prove each essential element of the crime so as to justify a rationale trier of fact in concluding beyond a reasonable doubt that RT was guilty of the offense of terrorizing.[3]
CHARGE OF VIOLATION OF LA. R.S. 14:54.1(A)
La. R.S.14:54.1(A) prohibits the “communicating of false information of planned arson” and defines the crime as:
*1243 A. Communication of false information of arson or attempted arson is the intentional impartation or conveyance, or causing the impartation or conveyance by |fithe use of the mail, telephone, telegraph, word of mouth, or other means of communication, of any threat or false information knowing the same to be false, including bomb threats or threats involving fake explosive devices, concerning an attempt or alleged attempt being made, or to be made, to commit either aggravated or simple arson. [Emphasis added.]
The plain wording of the statute makes it clear that only false threats are covered. The gravamen of the crime is not concern over the potentially life threatening consequences of a real bombing, but rather the potential inconvenience and/or disruption and alarm that can be caused by creating the perception, albeit false, that a real bombing might be afoot.[4] Unlike the crime of terrorizing, with which RT was also charged, the wording of this statute does not make the crime depend on causing actual fear or creating a condition of public disruption. The crime is complete with the verbal act of conveyance of a false threat to another person, regardless of the impact that the utterance may have on the particular person who receives it.[5] Words which by their very utterance may cause alarm, public disruption, [7or constitute a signal to prompt unlawful action fall within the principle of the false cry of “fire” in a crowded theater and are characterized as verbal acts unprotected by constitutional prohibitions against restraint of free speech. Schenck v. United States, 249 U.S. 47, 89 S.Ct. 247, 68 L.Ed. 470 (1919). We have no trouble concluding that the state has a legitimate interest in criminalizing apparently serious, albeit false, bomb threats, notwithstanding that the crime is committed through the medium of speech. The First Amendment does not protect criminal activity, even when carried out with words.[6]
The state introduced the testimony of two witnesses to the principal incident underlying the charge of violation of La. R.S. 14:54.1(A).[7] Although their versions of the *1244 words used by RT varied somewhat, both testified that when asked if he were going to blow up the school, RT answered in the affirmative in a serious manner. Moreover, RT himself admitted at trial that the exchange concerning a bomb did take place. He testified that despite indicating to two fellow students that he would bomb the school, he had no true intent to do so. Thus, the state presented uncontradicted evidence that information of a planned bombing was communicated and that the communication was false.
Fellow student JW testified, “I asked him was the rumor true that he was going to blow the school away?” RT’s answer was, “I’m gone [sic] do it when 18everybody least expects it and kill as many people as [I] can.” The prosecutor asked if RT smiled or laughed when he said this. JW responded, “No ma’am, he just kind of looked serious.” JW did not believe RT at first but became concerned the next day when people were checking out of school and rumors about RT continued to circulate. He then believed that his life was in danger. While JW agreed that the stereotype of RT as resembling the Columbine shooters had more to do with his fear than the verbal exchange about the bomb, he testified that his fears were heightened or increased after his conversation with RT.
The second witness to testify concerning the exchange at issue was MG. MG was seated next to JW when JW questioned RT about bombing the school. His recollection was that JW asked RT, “Are you going to blow up the school” and RT answered, “Yeah I am.” The following exchange between MG and the prosecutor is of particular note:
Q. After RT advised or informed you that he was going to blow up that school, that evening were you concerned for your safety at that immediate moment?
A. Yes ma’am.
Q. Did you believe that RT would blow up the school?
A. Yes ma’am.
Q. Did you believe this because he said he would do it?
A. Yes ma’am.
Like JW, MG confirmed that RT did not laugh, smile, or indicate in any way that he was joking when he made his statement. Although RT testified that he did not intend to be taken seriously and smiled, rolled his eyes, and made the comment in a sarcastic tone before walking away, the trial judge was entitled to make | sa credibility call and accept the testimony of the prosecution witnesses that RT appeared serious rather that RT’s self-serving testimony to the contrary. The trier of fact was likewise entitled to conclude, based on the evidence presented, that a reasonable person hearing RT’s affirmation of intent to bomb the school would have taken it seriously, especially in the context of the situation.[8] Accordingly, there was sufficient evidence presented to justify a rational trier of fact in concluding beyond a *1245 reasonable doubt that RT was guilty of a violation of La. R.S. 14:54.1(A).
Notwithstanding that the evidence presented squarely satisfied the elements of the crime spelled out in the statute, defendant argues that a conviction for violation of La. R.S. 14:54.1(A) cannot be sustained against a First Amendment challenge unless two additional elements of the crime are read into the statute. He claims that the person who makes the threat must have specific actual subjective intent to cause fear and the particular person(s) to whom the threat is conveyed must actually feel threatened. He claims that otherwise, the threat is not a “true threat” and constitutes protected speech.[9]
*1246 InWe decline defendant’s invitation to embellish upon the statute in the manner he suggests. First, the statute itself does not make specific intent by the defendant an element of the crime. In the absence of qualifying provisions in a statute, the terms “intent” and “intentional” have reference to general criminal intent.[10] La. R.S. 14:11. Just as a false cry of “fire” in a theater can be prohibited as unprotected speech, even where the offender intends it only as a practical joke, the state has a legitimate interest in prohibiting apparently serious threats of bombings, even when made in secret jest. Proof of specific intent to cause fear is not essential when the false threat made is such that a reasonable person might take it seriously under the circumstances | ^.and in the context in which the statement is made. Nor does the statute specify that the false threat communicated must accomplish any particular consequence or cause actual subjective fear to the particular recipient(s) of the threat. The tenth false cry of “fire” made with apparent seriousness does not become protected speech simply because theater patrons have tired of reacting.[11]
*1247 |13It is regrettable that RT answered JW’s question about a potential bombing as he did. It might be true, as he testified at trial, that he made the statement at issue because he was frustrated at having been asked all day long about whether he was going to blow up the school. Indeed, the trial judge may well have taken that into consideration in specifying that he serve his sentence in a non-secure setting. However, with the climate of fear already surrounding the school, and with RT’s knowledge that people were especially in fear of him, it was particularly bad judgment to falsely confirm that he intended to blow up the school. It does not become more acceptable to yell “fire” in a crowded theater because the offender does it out of anger, frustration, or because he has a bad day at the hands of others. The state has a legitimate interest in prohibiting false bomb threats.
ORDER
For the reasons assigned, the judgment of the court of appeal is affirmed insofar as it relates to the charge of violation of La. R.S. 14:40.1(A). It is reversed and set aside insofar as it reversed the verdict of the trial judge on the charge of violation of La. R.S. 14:54.1(A). The verdict of the trial judge as it relates to that statute is reinstated. The case is remanded to the trial judge to issue such orders as he may deem appropriate.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
KNOLL, J., concurs in the result.

 James C. Gulotta, Justice Pm Tempore, sitting for Associate Justice Harry T. Lemmon.

. 33,246 (La.App.2d Cir. 12/23/99), 748 So.2d 1256. RT was released on Dec. 23, 1999, *1241 having served all but approximately four months of the detention ordered.

. 00-0205 (La.10/27/2000), 772 So.2d 111.

. Defendant argued in the appeal court that the statute cannot criminalize statements based on the subjective reaction of a listener and that statements should not have a criminal consequence unless a reasonable person would be in a state of "sustained fear.” In our view, our determination that the state failed to carry its burden of proof of any "sustained fear”, reasonable or unreasonable, makes it unnecessary for us to address this attack on the statute.

. State v. McKeel, 452 So.2d 1171 (La. 1984).

. Except for our decision in State v. McKeel, supra, in which we held that a violation of La. R.S. 14:54.1(A) must involve a false threat, the only reported case (other than the one before us) which deals with this statute is State v. Sloan, 32,101 (La.App.8/18/99), 747 So.2d 101. In Sloan, defendant telephoned a bank, upset about a loan, and made statements about a bomb. The bank receptionist called the fire department to investigate. Defendant was charged with a violation of La. R.S. 14:54.1(A). Later defendant contended that the "bomb” he was referring to was informing the news media about his ill treatment by the bank. On appeal, defendant raised the issue of sufficiency of the evidence. The court of appeal concluded in Sloan that a reasonable juror could have concluded from the evidence presented at trial that the proof was sufficient that defendant in fact made the telephone call and communicated a false threat. No other necessary elements of the crime were enumerated. The court of appeal ultimately reversed the conviction, but only because the jury had returned a verdict of attempt to violate the statute, an unresponsive verdict which it was bound to notice as error patent.

. In State v. McKeel, supra, Justice Dennis, in a concurring opinion, specifically concluded that the making of a false threat in violation of La. R.S. 14:54.1(A) is beyond the protection of the First Amendment. See also, United States v. Quinn, 514 F.2d 1250 (5th Cir.1975), cert. den., 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976); Burnham Broadcasting Co. v. Williams, 93-0409 (La.App. 4th Cir. 12/16/93), 629 So.2d 1335.

. The state also introduced the testimony of a third student regarding a separate conversation about a bombing. However, the state did not charge RT with two counts of violation of the statute. Since we find him guilty on the *1244 basis of the incident discussed in the body of this opinion, we deem it unnecessary to examine whether the evidence of this additional incident could have justified a conviction.

. The fact that JW and MG attended school the next day does not prove that a reasonable person would not have taken the threat seriously or disprove their own apprehension. There are many occasions when people continue about their life activities in the face of threats, hoping them to be false, yet with trepidation. Workers frequently ignore fire alarms which they hope are caused by mechanical error. Every false bomb threat and threat on life in this country does not result in the closure of buildings and schools or cause business to grind to a halt. That does not make the communication of false threats any less dangerous or objectionable.

. A number of federal statutes exist regarding the making of real and/or false threats in a variety of contexts. For example, 18 U.S.C. 871(a) prohibits threats against the President. In Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) the Supreme Court held that in order to prove a violation of the statute, the government must prove a "true threat” as opposed to a statement that is political hyperbole. Watts, the court opined that a "true threat” is determined by using an objective standard to judge hnthe conduct of the defendant. "If a reasonable person would foresee that an objective rationale recipient of the statement would interpret its language to constitute a serious expression ... the message conveys a 'true threat.' ” Id. at 362. See also United States v. Welch, 745 F.2d 614 (10th Cir.1984). 18 U.S.C 844(e) prohibits the conveyance of "false information knowing the same to be false, concerning an attempt ... to ... intimidate any individual ... or unlawfully to damage or destroy any building ... by means of an explosive....” In United States v. Spruill, 118 F.3d 221 (4th Cir.1997), a defendant who made 200 successive threatening calls in the wake of the Oklahoma Federal Building bombing was found to have violated the statute, notwithstanding claims of First Amendment protection and an argument that his "drunken ramblings” did not constitute a "true threat.” Whatever defendant’s private intent, the threat seemed serious to the recipient of the calls. 18 U.S.C. 876 prohibits sending threats by mail. In United States v. Malik, 16 F.3d 45 (2nd Cir.1994), the court held that the test of whether an expression constitutes a threat outside of First Amendment protection is an objective one, i.e., whether an ordinary reasonable recipient of the communication, familiar with the context, would interpret the words as a threat of injury. An objective test was also adopted to determine if a "threat” was made in United States v. Orozco-Santillan, 903 F.2d 1262 (9th Cir.1990) which dealt with violation of 18 U.S.C. 115 prohibiting threats to assault a federal law enforcement officer. See also United States v. DeAndino, 958 F.2d 146 (6th Cir.1992) and United States v. Schneider, 910 F.2d 1569 (7th Cir.1990).
The cases cited above do not deal with a defense in which the defendant claims that his words did not constitute a "threat” because he meant them in jest or spoke them sarcastically, without specific subjective intent that his words be taken at face value. However, defendants have often posed such a defense to a charge of violation of 18 U.S.C. 35(b) which prohibits false threats of a violation of section 32, which in turn prohibits, inter alia, placing explosives on an aircraft. Most courts have held that the statute covers words spoken in jest as well as those uttered with specific intent to harm the carrier by causing fear and consequent interruption of traffic. In United States v. Silver, 196 F.Supp. 677 (E.D.Pa.1961), defendant told the ticket agent as he checked in at the airport that he had a bomb in his briefcase. The agent took the statement seriously. At trial defendant argued that he meant his statement as a joke. The court's treatment of the defense is highly persuasive:
There is no doubt but what the statement that he had a bomb in his briefcase was made in jest, but the peculiar sense of humor attributable to this defendant does not lessen the seriousness of the legal consequences of his acts.
... It is obvious that Congress intended by this section to prohibit exactly what happened here. We cannot help but take judicial notice of similar situations elsewhere where individuals of a completely distorted sense of humor or pranksters with juvenile minds have caused expensive delays, investigations, hardships, and induced fear by such acts. Id. at 678.
See also, United States v. Allen, 317 F.2d 777 (2nd Cir.1963) and United States v. Rutherford, 332 F.2d 444 (2nd Cir.1964) in which *1246 the court held that a statute limited to imparting false information with respect to the existence of a bomb on an aircraft would be beyond the protection of the First Amendment and fall within the principle of the false cry of "fire” in a crowded theater. The cases decided under this federal statute make no reference to the "true threat” test. However, in each instance the recipient of the threat reasonably understood it as a serious threat, notwithstanding the intent of the speaker.
At least one state court has considered whether a statute can constitutionally prohibit false bomb threats without requiring proof of the subjective intent of the speaker and/or the effect on the particular listener. In State v. Berberian, 459 A.2d 928 ( R.I.1983), the court held:
[I]n order to violate this statute, it is sufficient that the threat be made, regardless of the subjective intention of defendant. The statute is not aimed at pure speech, it is designed to prevent harmful and frightening verbal acts. It is not necessary, therefore, to examine the subjective intention of the author of the false report or the subjective reaction of the recipients. Id. at 931.

. We have held that specific intent is required where the statutory definition of a crime includes the intent to accomplish a particular consequence. State v. Fuller, 414 So.2d 306 (La.1982). In this case, the statute does not refer to the accomplishment of a consequence and defines the crime as the act of communication of false information concerning, inter alia, bomb threats, without reference to the consequences of the communication.

. We find it unnecessary to engage in a further lengthy discussion of defendant's challenge to the sufficiency of the evidence, which is based primarily on an interpretation of the statute which we have rejected. Courts need not consider superfluous challenges or make broad pronouncements as to the meaning, of statutes or the constitution when a case can be fully resolved on a narrower ground. See e.g., Greater New Orleans Broadcasting Ass'n., Inc. v. U.S., 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999); State v. Hills, 99-1750 (La.5/16/00), 761 So.2d 516, 520, n. 6; In re Pitre, 93-2322 (La.1/14/94), 630 So.2d 700. We reject defendant’s claim that the statute is overbroad and vague unless interpreted in the manner he suggests. Defendant’s own conduct fell squarely within the realm of a permissibly prohibited illegal verbal act. It is true that the first amendment doctrine of substantial overbreadth is an exception to the general rule that a person to whom a statute can constitutionally be applied cannot challenge the statute on the ground that it may be unconstitutional as applied to others. However, we have recognized that overbreadth must be "substantial” before a statute is invalidated on its face and that where possible, a limiting construction should be made to avoid constitutional problems. See, State v. Cinel, 94-0942 (La. 11/30/94), 646 So.2d 309. A litigant charging substantial overbreadth must demonstrate from the text of the law and actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally and must show a realistic danger that the statute will significantly compromise First Amendment protections of persons not before the court. Cinel, supra.
*1247 Defendant has failed to make such a showing in this case. Moreover, in our view the only possible situation in which the statute could arguably prohibit protected speech is if it were used to prosecute a person for making a false bomb threat in a context where no reasonable person could interpret the threat as serious, such as when the threat is both made and understood as a jest. In such a case, it is highly unlikely that the incident would be reported or prosecuted. Thus, there is no realistic danger that the statute will significantly compromise the rights of persons not before the court. Moreover, our interpretation of the statute as requiring a threat which has the appearance of seriousness obviates such a danger.
Defendant's claim that the statute is void for vagueness is similarly without merit. We rejected such a claim in State v. McKeei, 452 So.2d 1171 (La.1984). The statute’s prohibitions are easily understandable and would not confuse or mislead a person of ordinary intelligence. Furthermore, a defendant may not establish vagueness by speculating about hypothetical conduct which arguably could be prosecuted under the statute. State v. Sandifer, 95-2226 (La.9/5/96), 679 So.2d 1324.