| t CARAWAY, J.
In this juvenile delinquency proceeding, the juvenile. R.T., was adjudicated delinquent under two statutes, one for terrorizing, La.R .S. 14:40.1(A), and one for communication of false information of planned arson, La.R.S. 14.54.1(A). Finding that the evidence was insufficient to adjudicate R.T. delinquent under either statute, we reverse the trial court’s ruling and order that R.T. be released.

*1258
Facts

To better understand this case, it is necessary to consider the circumstances surrounding the events leading up to the juvenile’s arrest. The events underlying this prosecution occurred shortly after the April 20, 1999 Columbine school shooting tragedy in Littleton, Colorado. Because he wore dark clothing, listened to heavy metal music, and apparently had had prior juvenile proceedings against him, R.T., a fifteen-year-old student at Jonesboro-Hodge High School, was singled out by other students and faculty following the Columbine massacre. Roy Barlow, the principal of Jonesboro-Hodge High School, testified at the adjudication hearing that on April 22, 1999, after receiving a note from a teacher, he called R.T. into his office to question him about a “hit list” and a picture of a pipe bomb. R.T. denied any knowledge of a list or bomb. That afternoon, after calling R.T.’s mother and having her come to the school, Barlow again asked R.T. about a hit list but R.T. stated that he did not know anything about it.[1]
After Barlow’s review of the suspicions surrounding R.T., Barlow contacted G. Wesley Horton, Chief of Police for Jones-boro, who placed two officers at the high school on April 23, 1999 and began an investigation. After | ^speaking with several students, R.T. was arrested on April 25, 1999. A hearing on the adjudication of delinquency was held on June 30, 1999.
The first incident with which R.T. was charged in this delinquency proceeding occurred on the afternoon on April 22, 1999. J.W., another student at Jonesboro-Hodge High School, while waiting for the buses outside the school, asked R.T. if the rumor was true that R.T. was going to “blow the school away.” At the hearing, J.W. testified that R.T. replied, “I’m gone [sic] do it when everybody least expect [sic] it and kill as many people as [I] can.” Although J.W. said that R.T. was not laughing when he said this and looked serious, J.W. admitted that he did not take the statement as true and only became concerned the next day when many students did not attend school. M.G., another student who was seated next to J.W. on the bench waiting for the school bus, heard J.W.’s question to R.T. and testified at the hearing that R.T. gave a single reply stating, “Yeah I am” and nothing more. Although M.G. said that he was worried for his safety after hearing R.T.’s response, M.G. did not miss any school as a result of his concern. Neither of the two boys reported the conversation to their parents or school officials and apparently only reported the matter after inquiries from the police.
R.T. testified at the hearing in his own behalf. R.T. stated that after the Columbine tragedy, several students had asked him about the crime or identified him as the person most likely to perpetrate a similar crime at Jonesboro-Hodge High School. When J.W. asked if he was going to blow up the school, R.T. testified that he sarcastically said “Oh yeah,” rolled his eyes and walked away. R.T.’s claim that he did not elaborate beyond his two-word answer coincides with M.G.’s report of the conversation. R.T. said that he never had any plan to bomb hthe school and that he thought J.W. and M .G. understood that he was not serious in his response to J.W.’s question.
The second incident forming the basis of the charges against R.T. was a conversation R.T. had with C.M. around the time of the Columbine tragedy. During class, R.T. told C.M. that it would be easy to have a shooting in the biology class. R.T. elaborated by explaining how he could have the doors blocked and people guarding the windows and then shoot the people in the classroom he disliked and skip the people he liked. At the hearing, when asked if R.T.’s discussion of this scenario made C.M. afraid, she responded, “Yes ma'am, but I didn’t — I wasn’t really — I *1259 didn’t know if he would do it to me, but I just didn’t really know what to think. I just kind of didn’t really think much about it.” R.T. also mentioned to C.M. that it would be easy to shoot people during ceremonies or group days when many students would be gathered.
R.T. admitted the basic substance of the conversation with C.M. during biology class. However, R.T. testified that he had no plan to shoot anybody and never said that he was going to do it; he merely was speculating on how such a shooting could occur. R.T. claimed to be concerned for his own safety and when asked why he would use the term “I” when describing how a shooting would or could happen, he responded, “[Ejvery time I use a scenario I use me. I put myself in everything I say.”
At the close of evidence, the trial court found that the state proved beyond a reasonable doubt that R.T. committed the acts under La.R.S. 14:40.1(A) and La.R.S. 14:54.1(A) with which he was charged and was therefore adjudicated delinquent. Following a disposition hearing on July 28, 1999, the trial court committed R.T. to the custody of the Department of Public Safety and Corrections |4for a period of one year with credit for all time served in detention and a recommendation that R.T. be placed in a non-secure setting.
R.T. appeals challenging on constitutional grounds the adjudications under the two statutes and urging that the state failed to produce sufficient evidence to convict under either statute.

Discussion

The Louisiana Children’s Code, enacted by Acts 1991, No. 235, § 8, effective January 1, 1992, provides that, “All rights guaranteed to criminal defendants by the Constitution of the United States or the Constitution of Louisiana, except the right to jury trial, shall be applicable in juvenile court proceedings...” La.Ch.C. art. 808. Therefore, even though this matter occurred in a juvenile proceeding, any constitutional analysis of a state statute would be equally applicable in an adult criminal proceeding. In a delinquency proceeding, the state must prove beyond a reasonable doubt that the child committed every element of the offense alleged in the petition. La.Ch.C. art. 883; State v. S.B., 31,264 (La.App.2d Cir. 9/25/98), 719 So.2d 1121. This standard is no less strenuous than the burden of proof required in a criminal proceeding against an adult. State in the Interest of R.E.B., 26,468 (La.App.2d Cir. 9/21/94), 643 So.2d 287; State in the Interest of J.W., 597 So.2d 1056 (La.App. 2d Cir.1992). Further, on appeal, the standard of review for the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. In the Interest of D.J., 29,474 (La.App.2d Cir. 4/2/97), 691 So.2d 839.
-LÍ-
Under the first disputed statute, R.T. is charged with the communication of false information of planned arson. The asserted crime arose out of R.T.’s comments to J.W. which M.G. overheard. La.R.S. 14:54.1(A) defines the crime as follows:
Communicating of false information of arson or attempted arson is the intentional impartation or conveyance, or causing the impartation or conveyance by the use of the mail, telephone, telegraph, word of mouth, or other means of communication, of any threat or false information knowing the same to be false, including bomb threats or threats involving fake explosive devices, concerning an attempt or alleged attempt being made, or to be made, to commit either aggravated or simple arson.
The crime of communicating false information of planned arson has been interpreted by our supreme court in a case where the statute was attacked as being *1260 unconstitutionally vague. State v. McKeel, 452 So.2d 1171 (La.1984). In McKeel, the defendant had made repeated threats to burn a rebuilt business establishment in New Orleans which had previously been the subject of a fire caused by the defendant’s act of arson. Rejecting the defendant’s attack that the statute was subject to multiple interpretations and vagueness, the court placed one interpretation on the statute and found that “in order to be punishable under the statute, a threat must be made with knowledge that it is false.” Id. at 1173. Under this interpretation, the defendant’s conviction, nevertheless, was overturned because the evidence indicated that he actually intended his threat to be real. The court stated that there was no evidence “which would show that defendant’s statements were made knowing them to be false.” Id.
In this case, the evidence that R.T. intended his statement to J.W. to be false was supplied by the defendant himself. Moreover, the record indicates that both J.W. and M.G. must have also recognized R.T.’s threat to bomb the school to be | fifalse because neither missed school the following day and both never voluntarily reported the threat to anyone.
The McKeel interpretation, therefore, presents no problem for adjudication under these circumstances with R.T. undis-putedly having made his statements to J.W. knowing them to be false with no intention to bomb the school. Nevertheless, the defense argues that an application of the statute abridges freedom of speech in violation of the First Amendment and Article I, § 7 of the Louisiana Constitution of 1974. It is asserted that a criminal statute aimed at speech or communication where neither the defendant nor the victim understands that any violent or otherwise criminal act will be carried out or is imminent amounts to punishment of protected speech.
First amendment rights are accorded a preferred place in our democratic society. First Amendment protection extends to a communication, to its source and to its recipients. Byers v. Edmondson, 97-0831 (La.App. 1st Cir.5/15/98), 712 So.2d 681. Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. DeSalvo v. State of Louisiana, 624 So.2d 897, 899 (La.1993), cert. denied, 510 U.S. 1117, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994). However, as speech strays further from the values of persuasion, dialogue and free exchange of ideas the First Amendment was designed to protect and moves toward threats made with specific intent to perform illegal acts, the state has greater latitude to effectively neutralize verbal expression. Shackelford v. Shirley, 948 F.2d 935, 938 (5th Cir.1991).
The statute in question does not directly punish arson or a bombing but punishes communication about an asserted arson or bombing known to be false by the defendant. As such, the crime in question is closely akin to an attempt or other 17inchoate crime. As our recent decision interpreting this statute in State v. Sloan, 32,101 (La.App.2d Cir. 8/18/99), 747 So.2d 101 has noted, “[c]ommunication of a threat has substantial inchoate elements.”
In reviewing First Amendment concerns in the context of inchoate crimes, our Chief Justice Calogero has written:
Inchoate offenses therefore differ from other penal laws, which typically do not implicate free speech and assembly concerns unless they directly target expressive conduct, e.g. “obscenity” ordinances. Compare Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). This is because inchoate offenses are by their nature incomplete and therefore lack a readily discernible corpus delicti; they consist solely of conduct or “overt acts” which on their face may appear innocent, but which when combined with the requisite criminal intent constitute a prosecutable violation of the criminal law. See 4 Blackstone, Commentaries on the Laws of England, Pp. 78-79 (Bernard C. Gavit *1261 ed., 1941); State v. Richards, 426 So.2d 1314 (La.1982); Moffett v. State, 96 Nev. 822, 618 P.2d 1223 (1980); State v. Taft, 143 W.Va. 365, 102 S.E.2d 152 (1958); State v. Quick, 199 S.C. 256, 19 S.E.2d 101 (1942); State v. Rider, 90 Mo. 54, 1 S.W. 825 (1886). When, as in the instant case, the “overt acts” involved include constitutionally protected speech or conduct, this Court has a constitutional duty to ensure that those rights are not im-permissibly infringed. See Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). “In other words, the [ordinance] must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression.” Gooding v. Wilson, 405 U.S. 518, 522, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972).
City of Baton Rouge v. Ross, 94-0695 (La.4/28/95), 654 So.2d 1311, 1330-1331, Calogero, C.J., concurring.
In this case, we view the statute as directed at communication or speech designed to stir.others to fear a threatened arson or bombing and to react in a manner that disrupts or victimizes their lives. The Louisiana Supreme Court addressed a somewhat similar situation in State v. Douglas, 278 So.2d 485 (La.1973), involving a First Amendment attack on the crime of inciting to riot. The court said:
| sSince no one would seriously contend that actual participation in a riot is protected by the First Amendment, it would seem that actions or endeavors or conduct to procure or incite others to riot is no less outside the protection of the First Amendment. For speech to constitute this conduct of inciting to riot, it must be a willful, intentional “endeavor” to gain as an immediate result....
In the federal system, a similar statute exists concerning false bomb threats. 18 U.S.C. § 35. In discussing the legislative intent for the criminal statute, the court in U.S. v. Rutherford, 332 F.2d 444, 446 (2d Cir.1964) stated:
If the statute so far as it applied to aircraft were limited to making criminal the imparting of false information with respect to the existence of a bomb on a loaded aircraft, there could be little doubt that the giving of the false information would be beyond the protection of the First Amendment. It would fall within the principle of the false cry of fire in a crowded theatre, the classic illustration of unprotected speech given by Mr. Justice Holmes in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470. Such speech is characterized as a “verbal act” by Mr. Justice Lamar in Gompers v. Buck’s Stove & Range Co., 221 U.S. 418, 439, 31 S.Ct. 492, 55 L.Ed. 797, cited in the Schenck opinion.
In the same sense, we view the speech proscribed by La.R.S. 14:54 .1(A) to be unprotected speech, and we construe the statute to be inoffensive to free speech. The statute requires that a “threat,” in this case a “bomb threat,” be communicated. For speech to be a threat, it must be understood from the perspective of both the communicator and the recipient(s) of the threat. By use of the term threat, the criminal consequences prescribed in La. R.S. 14:54.1(A) include the necessity for the receipt of the communication by a victim who is threatened. The defense would not argue that a criminal statute prohibiting the false threat of a fire in a crowded theater is unconstitutional. The threatened person’s reaction to such “verbal act” can be measured apart from the mere act of speaking so as to demonstrate that the defendant’s speech was not protected speech. La.R.S. 14:54.1(A)’s requirement that victims receive a threat and thus react with a response such as fear to that threat allows this crime of communicating false information of planned arson to withstand R.T.’s constitutional challenge.
| {¡Nevertheless, R.T. also argues and assigns as error the state’s failure to produce sufficient evidence for the conviction in this instance. We agree. The *1262 standard for evaluating sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find that the state proved all elements of the crime beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Washington, 597 So.2d 1084 (La.App. 2d Cir.1992). Of course, it is always the function of the trier of fact to assess credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1998). Where a trier of fact has made a rational determination, an appellate court should not disturb it. State v. Thomas, supra.; State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied, 604 So.2d 973 (La.1992).
As to the alleged bomb threat, the facts show that due to the large amount of publicity surrounding the Columbine high school shootings, many students at Jones-boro-Hodge High School were speculating that if a similar crime were to be executed at their school, R.T. was the most likely suspect. After a couple of days of these rumors, J.W. asked R.T. if he was planning on “blowing away” the school. It is significant to us that in this causal setting, the discussion of the “bomb threat,” a necessary element of this crime, was first initiated by J.W. and not R.T. J.W. invited a response from R.T., who the record indicates was the target of rumors at the school. Next, as indicated above, given the narrow interpretation of the crime of communicating false information of a planned bombing under the McKeel ruling, it was essential for the state to show that R.T., in responding to J.W.’s prompting, never intended to bomb the school. Finally, and most significantly, neither J.W. nor M.G. were shown by the state to have reacted in any manner to demonstrate that they were actually threatened. In fact, J .W., who was the only |indirect participant in the conversation with R.T ., denied ever being threatened by R.T.’s statement. Accordingly, we find that the state did not prove beyond a reasonable doubt that a bombing threat was received as a threat by J.W. and M.G. and R.T.’s adjudication of delinquency under the false arson statute is reversed.
II.
The second disputed statute is the terrorizing statute, La.R.S. 14:40.1(A), under which R.T. was charged for both his conversation with J.W. and his conversation in biology class with C.M. This statute was recognized by the Fourth Circuit Court of Appeal in its ruling in the McKeel case as defining a very similar crime to that addressed under La.R.S. 14:54.1(A). State v. McKeel, 443 So.2d 753 (La.App. 4th Cir.1983). The crime of terrorizing is defined in the statute, as follows:
Terrorizing is the intentional communication of information, known by the offender to be false, that the commission of a crime of violence is imminent or in progress or that a circumstance dangerous to human life exists or is about to exist, thereby causing any person to be in sustained fear for his or another person’s safety; causing evacuation of a building, a public structure, or a facility of transportation; or causing other serious disruption to the public.
The elements of this offense likewise concern: (i) false information intentionally communicated and (ii) an immediacy element concerning the false information or threat that causes fear or serious public disruption. Given the close parallel between this terrorizing crime and the crime of communicating false information of an arson, we reject R.T.’s constitutional claims against the statute for the reasons expressed above, but also find that the incident between R.T. and J.W. was likewise not sufficiently proven by the state for the reasons expressed above.
R.T. further assigns as error the insufficiency of the state’s proof of the crime of terrorizing concerning his conversation with C .M. Given the immediacy Inelement of the crime which requires that C.M. be shown to have perceived the threatened false crime as “in progress” or “about to exist,” we again agree that a *1263 rational finder of fact could not conclude beyond a reasonable doubt that the charged offense occurred.
C.M.’s description of R.T.’s discussion of the security of biology class and other school functions was far from clear. The scenario of shooting students in the biology class was more than hypothetical as shown by the following exchange:
Q. Did he indicate at all that he would skip over you? That you would be one of the ones that he skipped over?
A. As far as I can remember, he told me that he would never do it to me.
Q. Did you believe that he would do it to others?
A. I didn’t know for sure.
Nevertheless, R.T.’s discussion of the “plan” was also described by C.M. more in terms of a hypothetical situation mirroring the Columbine tragedy as evidenced by the following exchange between C.M. and the assistant district attorney:
Q. When speaking about barricading the doors, did he use the ■ word somebody or did he use the word all I have to do?
A. He said all you have to do is and then he went over the whole plan and he just said all you have to do is this and this and this and all that.
* # * * # *
Q. When R.T. told you about what he could do in Ms. Watts! class room, did you have any doubt he was speaking of anyone other than himself?
A. I truthfully didn’t know if I doubted him or if I believed him or what.
Like C.M., we are left with considerable doubt regarding whether R.T. was speaking purely hypothetically about inadequate security at the school, trying morbidly to impress a classmate who he assured would not be killed, or describing |12as a coldblooded terrorist a plan which he actively desired to carry out. R.T.’s speech was difficult for even C.M. to interpret. Yet the definition of the crime of terrorizing goes beyond R.T.’s speech and requires a showing that the horrendous crime he described was communicated as “in progress” or “about to exist” so as to cause any person like C.M. upon hearing of the crime “to be in sustained fear.”
'What is very clear from C.M.’s testimony is that she did not believe R.T. was about to act. She did not express immediate fear, only confusion over what R.T. may have meant. She did not testify that she stopped attending biology class thereafter and refused to sit next to R.T. She did not testify that she immediately advised the teacher, principal, or her parents of the discussion. It was not until days after R.T.’s arrest for the bombing threat incident that this incident with C.M. arose in these proceedings. Accordingly, the state’s evidence to prove the crime of terrorism was insufficient and the adjudication of delinquency under the statute is reversed. ■

Conclusion

For the foregoing reasons, we reverse R.T.’s adjudication of delinquency under the two criminal statutes and his sentencing disposition and order that R.T. be released.
REVERSED; DEFENDANT ORDERED RELEASED.

. The inquiries and disciplinary proceedings which Barlow and other school officials made or could have made regarding R.T. are not the subject of this action which is a criminal proceeding under the juvenile jurisdiction of the district court.