MARC E. JOHNSON, Judge.
|2Pefendant was charged with terrorizing, a violation of LSA-R.S. 14:40.1, and was found guilty by a unanimous jury verdict in the 24th Judicial District Court. Defendant was sentenced by the trial court to serve twelve (12) years in the custody of *977 the Department of Corrections. For the following reasons, we affirm defendant’s conviction and sentence.

STATEMENT OF THE CASE

On June 27, 2007, the Jefferson Parish District Attorney filed a bill of information charging defendant, Mitchell Lewis, Jr., with terrorizing in violation of LSA-R.S. 14:40.1. Defendant was arraigned on July 24, 2007 and pled not guilty. On August 1, 2007, defendant filed a motion to appoint sanity commission to determine competency to stand trial. On September 19, 2007, a competency hearing was held, after which the trial court found defendant not competent to stand trial. The trial court ordered defendant committed to a mental health facility. Competency hearings were held again on April 8 and September 16, 2008, after which the trial court found defendant competent to stand trial both times.
| ^Defendant filed a motion for speedy trial on October 14, 2008. On January 12, 2009, the trial court granted the State’s motion for continuance of the trial. Defendant subsequently filed a writ application with this Court, challenging the trial court’s ruling on the motion to continue trial. On March 24, 2009, this Court granted the writ application for the limited purpose of reviewing his request for mandamus under LSA-C.Cr.P. art. 701(D). This Court denied the writ in part, finding that defendant had not shown that his right to speedy trial had been violated. This Court also granted the writ in part, finding that the 120-day time period delineated in the statute would run if trial was not commenced by March 31, 2009.
On March 31, 2009, the morning of trial, the trial court denied defendant’s motion to suppress statement. On March 31 and April 1, 2009, the case was tried by a six-person jury, which unanimously found defendant guilty as charged. The trial court sentenced defendant on June 25, 2009 to imprisonment at hard labor for 12 years. On that same date, defendant filed a timely motion for appeal that was granted.

FACTS

The following facts were elicited at trial.
On May 21, 2007, at 1:14 p.m., defendant, who lived in Gretna, called Sony Corporation and spoke to Hugo Avila, a customer service representative in Nuevo Laredo, Mexico. Defendant told Mr. Avila that he wanted to have his “unit” replaced. After checking the work order, Mr. Avila learned that the “unit” was damaged and, therefore, not eligible for replacement. Defendant said that he did not cause the damage, and that the damage was caused either during shipping or by a technician.
|4Pefendant became very upset and said all he wanted was to have his “unit” replaced, and that he wanted to avoid going to small claims court. Mr. Avila again told defendant that it was not possible to have his “unit” exchanged or replaced, and that the “unit” no longer had a warranty on it, so they were unable to do anything. In a threatening manner, defendant told Mr. Avila that he might go to Laredo with a gun. Defendant then added, “I don’t deal with small guns. I deal with bombs.”
Mr. Avila told defendant he would be documenting their conversation in the file. Defendant told Mr. Avila that they had his number and to call the police because “they already knew who he was.” Mr. Avila again said he would document the conversation, and defendant said, “Okay. We’ll see you in small claims.” Mr. Avila did not refer that call to a supervisor or alert anyone.
On that same date, at 5:45 p.m., defendant called Sony Corporation again and spoke to Chantal Lamotte, a customer service representative in Fort Myers, Florida. Defendant was very angry because they *978 could not repair his “unit”, and he was very hostile on the phone. In a threatening manner, defendant said three or four times he would “blow up the building,” not he had blown up his “unit.” He also said, “You don’t know what I’m capable of. I’ve gone to the airport with knives and a gun, and it took eight policemen to hold me down.”
Ms. Lamotte told defendant that their call could possibly have been recorded. Defendant responded that he hoped that someone was listening, and that that person would call the police, because he wanted them to arrest him so he could be on television and tell everybody how bad Sony products were. Ms. Lamotte testified that she felt threatened even though she knew defendant was in Louisiana, and not in Florida where she was; however, she later testified that she did not personally feel threatened by defendant at that time because she and defendant ftwere not in the same state. Ms. Lamotte immediately reported the call to her supervisor, because they were told to report any kinds of threats if they felt that “it could be dangerous.”
The next day, early in the morning, Eloy Gutierrez, the on-site manager of the Sony Electronics Laredo, Texas facility, received a call on his cell phone alerting him that there was a customer who was very upset and had made threats on the Laredo facility in Texas.[1] Mr. Gutierrez understood that the threat was that this customer stated that he had placed some explosives in some of the packages that he had shipped back to their facility, and that he was also threatening to drive all the way to Laredo to confront them with a handgun. After learning that information, Mr. Gutierrez immediately evacuated the 35,000 square foot facility in Laredo, Texas, where they employed 150 people.
Mr. Gutierrez also contacted Sony’s vice presidents at headquarters in San Diego, Sony’s Vice President of World Security, and the police department. The Laredo Police Department received the call at 9:21 a.m. and responded within minutes. The fire department also arrived, and they searched around the building. Once the police learned there was a bomb threat on the building, they brought in two K9 handlers with two bomb-sniffing dogs who searched the inside of the facility and the trailers in the receiving docks; however, they did not find any explosive devices. Mr. Gutierrez noted that they received approximately 2,500 parcel units per day. The evacuation took approximately four hours and cost Sony approximately $6,000.00.
Because they were concerned that something might be in transit, Mr. Gutierrez contacted their mail delivery services to ensure that they checked their fthubs. Additionally, Mr. Gutierrez hired two K9 handlers for the following three days to check every parcel unit that came in to make sure that no explosives were in the boxes. Also on that day, the Gretna Police Department received a call in reference to a terrorizing threat made by defendant. Officer Craig Dougherty was then dispatched to defendant’s residence at 500 Solon Street in Gretna to investigate the complaint. Before he went to defendant’s residence, he talked to Ms. Lamotte who told him the threats defendant had made. Officer Dougherty then went to defendant’s residence and identified himself. He repeated the threats defendant had *979 made to Ms. Lamotte, and defendant admitted that he made the calls and the two separate threats.
Officer Dougherty testified that defendant was frustrated and upset because his Sony receiver was not working properly, so he made a threat saying that he was going to go over there and blow up the corporation in Laredo. Defendant also admitted saying that he did not deal with small guns, but with bombs. Officer Dougherty testified that it looked like defendant would follow through with those threats if given the opportunity.
Defendant told the officer that he also said, “You don’t know what I’m capable of. I went to the airport here in New Orleans with a BB gun and a knife, and it took me [sic], I don’t know, six or eight officers to hold me down.” Officer Dougherty explained that defendant seemed “pretty proud” of terrorizing and making threats to harm people. He did not get a statement from defendant because road officers do not obtain them. Officer Dougherty testified that defendant had also threatened McCann Electronics in Metairie.
Michael Lewis, defendant’s brother, testified that prior to September of 2007, he communicated with defendant every day or every other day. He further testified that he had no knowledge that defendant was thinking of going to Laredo, pTexas. He explained that defendant would not have done that, and he knew that because defendant talked to him about what was occurring in his life. Mr. Lewis asserted that defendant did not own firearms and was not violent or dangerous. He stated that he had never known defendant to buy bomb-making material, and that defendant would not know how to make a bomb. He was aware of defendant’s past convictions, and did not deny the trespassing charge where defendant went to the airport with a BB gun and plastic knife, and it took eight officers to subdue him.
Defendant, age 56, testified that he had past convictions. He pled guilty to theft for removing his car from a repair shop without permission, and in 1998, he pled guilty to simple battery. He recalled a trespassing charge in connection with an airport incident, explaining that it involved him driving a cab and trying to return something to one of his passengers.
Defendant testified that he bought a Sony component on January 28, 2006, and that it came with a five-year warranty. Defendant explained that he had to send it to Laredo four times between February of 2006 and January of 2007 to have it serviced because it was not working properly. After January of 2007, he brought it to McCann Electronics. Defendant alleged that McCann Electronics would not repair it because Sony personnel told them that he had “done something” to the internal parts, and that he was playing it too long and too loudly.
Defendant admitted that, on May 21, 2007, he made two calls to Sony: one regarding his television set, and the other regarding his receiver. He denied knowing that he was speaking to anyone in Laredo. Defendant testified that he did not threaten to blow up the building in Laredo. With respect to the first call, defendant denied telling Mr. Avila that he might come to Laredo with a gun and that he did not deal with small guns but with bombs.
| sWith respect to the second call, Ms. Lamotte told him he had broken his “unit.” Defendant replied that he had not. He explained to her that he was watching a DVD and saw smoke coming from the “unit,” after which he heard popping sounds. He further explained to her that the “unit” blew up. When she asked him if he was threatening her, he responded *980 negatively and said that he was just trying to get his “unit” repaired. He denied telling Ms. Lamotte she did not know what he was capable of doing.
Defendant asserted that Sony “took something way out of proportion” because they knew his “unit” was under warranty and did not want to repair it. He testified that he told Ms. Lamotte that his “unit” blew up on him, and that she may have taken it out of context. Defendant denied telling Ms. Lamotte that he had once gone to the airport with a BB gun and a knife and that it took eight policemen to hold him down.
Defendant testified that he did not own guns. He stated that he did not know how to make bombs and had no reason to make any. Defendant further testified that he did not threaten to go to Laredo or say he might go to Laredo with a gun. He explained that he had no reason to go to Laredo, and that all he needed to do was send his component there.
Defendant also denied telling anyone at Sony that he dealt with big bombs and big guns. He insisted that he never intended to frighten Sony employees or anyone else, and he did not intend to cause an evacuation of the building in Laredo. Defendant denied telling the officer that he had called and threatened to blow up the Laredo, Texas building that day. He testified that he did not plan to or try to ship bombs or explosives to that address, and that he had none to ship.
Defendant explained that he did not join the Air Force earlier in his life, because he could not kill anyone. He further explained that he used to hunt with |9his father, but disposed of his guns when he was a teenager because he could not kill animals anymore.

ASSIGNMENTS OF ERROR

On appeal, the defendant raises the following assignments of error: 1) he was convicted based upon legally insufficient evidence of guilt, and the entry of a verdict based that evidence denied him due process of the law, and which mandates a reversal; 2) the sentence is unconstitutionally excessive in that it “shocks the conscience,” is grossly inappropriate to the nature of the offense and the character of the offender, and was imposed without any articulated basis; and, 3) he received ineffective assistance of counsel when his trial counsel failed to file a motion to reconsider the excessive sentence.

Assignment of Error Number One

Defendant argues that the evidence was legally insufficient to support the conviction. He contends that the evidence shows that he never told the customer service representatives that he was going to mail a package with a bomb in it to Laredo. He further contends that an unidentified person in the chain of command distorted what had been said. Defendant asserts that the evacuation took place over 12 hours after the alleged threat and, therefore, it was not an imminent threat. He further asserts that there was no sustained fear by either of the customer service representatives or by members of the general public. Defendant claims that he had no criminal intent, and that he only wanted the representatives to assist him in having his receiver repaired or replaced. He argues that he was guilty of, at most, criminal negligence. He notes that there was no evidence of any plan to bring a bomb threat, or any other kind of threat, to fruition.
The State responds that, although Mr. Avila was not in fear of defendant’s threats, Ms. Lamotte and Mr. Gutierrez each thought the threats were imminent 110enough to report the incident and evacu *981 ate the facility, respectively. The State also contends that the evidence showed that Sony maintained a sustained fear that defendant’s threats were imminent, and that defendant intended to cause a disruption.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342, p. 7 (La.10/17/00); 772 So.2d 78, 83; State v. Washington, 03-1135, p. 4 (La.App. 5 Cir. 1/27/04); 866 So.2d 973, 977.
In the instant case, defendant was convicted of terrorizing in violation of LSA-R.S. 14:40.1. At the time the offenses were committed in May of 2007, the statute provided, in pertinent part:
A. Terrorizing is the intentional communication of information that the commission of a crime of violence is imminent or in progress or that a circumstance dangerous to human life exists or is about to | nexist, with the intent of causing members of the general public to be in sustained fear for their safety; or causing evacuation of a building, a public structure, or a facility of transportation; or causing other serious disruption to the general public.[2]
In the instant case, the State first had the burden of proving the intentional communication of information that the commission of a crime of violence was imminent or in progress, or that a circumstance dangerous to human life existed or was about to exist. LSA-R.S. 14:40.1; See State v. Jason, 08-1319, p. 4 (La.App. 3 Cir. 5/6/09); 9 So.3d at 338.

Imminent threat

Defendant told Mr. Avila that he was angry because Sony would not repair his “unit,” and that he might go to Laredo with a gun and that he dealt with bombs. A few hours later, defendant told Ms. La-motte that he was very angry because Sony could not repair his “unit,” and in a threatening, hostile manner told her three or four times that he would “blow up the building.”
In order to show Ms. Lamotte that he was serious and capable of carrying out his threats, defendant said, “You don’t know what I’m capable of. I’ve gone to the airport with knives and a gun, and it took eight policemen to hold me down.” Al *982 though Ms. Lamotte testified that she did not personally feel threatened by defendant because she and defendant were not in the same state, she clearly felt that the call warranted action since she immediately reported it to her supervisor. She explained that they were told to report any kind of threats if they felt “it could be dangerous.”
In State ex rel. R.T., 33,246 (La.App. 2 Cir. 12/23/99); 748 So.2d 1256, writ granted, 00-0205 (La.10/27/00), 772 So.2d 111, affirmed in part, reversed in part \^by, 00-0205 (La.2/21/01), 781 So.2d 1239, the Second Circuit addressed the portion of the statute involving “imminent” threats and “sustained fear.” In that case, R.T. argued on appeal that the evidence was insufficient to support his terrorizing adjudication with respect to two incidents that occurred around the time of the Columbine school shooting. During the first incident, J.W. asked R.T. if the rumor was true that R.T. was going to “blow the school away.” Id. at 1258. J.W. testified that R.T. replied that he was going to do it when everybody least expected it, and he would kill as many people as he could. Id. M.G., however, testified that R.T. only said, ‘Yeah I am.” Id. Neither boy reported the conversation to their parents or school officials. Id. The Second Circuit found that that incident was not sufficiently proven, because neither boy was shown by the State to have reacted in any manner to demonstrate that they were actually threatened. Id. at 1262.
During the second incident, R.T. told C.M. that it would be easy to have a shooting in the biology class. State ex rel. R.T., 748 So.2d at 1258. According to C.M., R.T. explained how he could have the doors blocked and people guarding the windows and then shoot people in the classroom he disliked and skip the people he liked. Id. R.T. testified that he had no plan to shoot anybody and never said that he was going to do it; he was merely speculating on how such a shooting could occur. Id. at 1259.
The Second Circuit stated that, given the immediacy element of the crime which required that C.M. be shown to have perceived the threatened false[3] crime as “in progress” or “about to exist,” a rational finder of fact could not conclude 11sbeyond a reasonable doubt that the charged offense occurred. State ex rel. R.T., 748 So.2d at 1262-63. It found that it was unclear whether R.T. was speaking hypothetically or describing a plan which he desired to carry out. Id. at 1263. The Second Circuit asserted that the definition of the crime of terrorizing required a showing that the crime he described was communicated as “in progress” or “about to exist” so as to cause any person like C.M. upon hearing of the crime “to be in sustained fear.” Id.
The Second Circuit found that it was very clear from C.M.’s testimony that she did not believe R.T. was about to act. State ex rel. R.T., 748 So.2d at 1263. It further found that C.M. did not express immediate fear, only confusion over what R.T. may have meant. The appellate court noted that C.M. did not testify that she *983 stopped attending biology class thereafter and refused to sit next to R.T., nor did C.M. testify that she immediately advised the teacher, principal, or her parents of the discussion. Accordingly, the appellate court concluded that the State’s evidence to prove the crime of terrorism was insufficient and the adjudication of delinquency under the statute was reversed. Id.
The Louisiana Supreme Court granted certiorari to review the correctness of that decision in State ex rel. R.T., 00-0205, p. 2 (La.2/21/01); 781 So.2d 1289, 1240-41. In that case, the supreme court agreed with the appellate court that the State did not present sufficient evidence to support an adjudication of delinquency for violation of the terrorizing statute. Id., 00-0205 at 4, 781 So.2d at 1242. The supreme court stated that there was no evacuation of any building, public structure, or facility of transportation, and there was no evidence that the conversation [between C.M. and R.T.] was repeated by C.M. or overheard by anyone else. Id. Therefore, the supreme court found that there was no evidence that any statements 114made to C.M. by R.T. could have caused any public disruption or could have caused fear in any person other than C.M. Id.
The supreme court found that the only portion of the statute that R.T. could possibly have violated was the section that prohibited the intentional communication of false information that a crime of violence is imminent or in progress, or that a circumstance dangerous to human life exists or is about to exist, thereby causing any person to be in sustained fear for his or another person’s safety. State ex rel. R.T., 00-0205 at 4-5, 781 So.2d at 1242. The supreme court also found that the conversation was more suggestive of a discussion of hypothetical conduct. It concluded that the testimony and conduct of C.M. refuted any contention that the conversation caused her any sustained fear. Id.
In State v. Jason, supra, the Third Circuit addressed the portion of the terrorizing statute involving “members of the general public” and “sustained fear.” In that case, defendant and his brother were watching a basketball game inside a gymnasium when Michael Fontenot and Troy Doucet arrived. Id., 08-1319 at 2, 9 So.3d at 337. Defendant approached Mr. Fonte-not and attacked him. Mr. Doucet attempted to intervene and was attacked by defendant’s brother. The men went outside where defendant verbally assaulted coaches and their families. Some people watched, some chose to leave, and some sought refuge inside the gym. The trial testimony revealed that defendant may have harbored a grudge against Mr. Fon-tenot. Id.
On appeal, defendant contended the evidence was insufficient to support a conviction under the terrorizing statute because the State did not prove that he made statements to anyone or that he made statements to the general public. State v. Jason, 08-1319 at 4, 9 So.3d at 339. Alternatively, defendant contended that the State failed to show that he made any statements loud enough or in a manner that 11swouId foreseeably alarm the general public and/or cause them to be in sustained fear for their safety. Id., 08-1319 at 4-5, 9 So.3d at 339. The Third Circuit found that the State presented sufficient evidence to show that defendant intentionally communicated information by making loud verbal threats and by screaming and hollering at several individuals, which were audible to the general public. Id., 08-1319 at 7, 9 So.3d at 340. Further, the court found that defendant’s verbal threats warned the specific individuals of impending physical violence and that he posed a danger to human life, thus satisfying the second ele *984 ment of the offense. Id. The appellate court also found that defendant’s actions were directed to the specific individuals involved and were not intended to place the general public in sustained fear, or to cause an evacuation of the gym, or to cause serious disruption to the general public. Id., 08-1319 at 8, 9 So.3d at 340. Consequently, the Third Circuit reversed defendant’s conviction of terrorizing. Id., 08-1319 at 9, 9 So.3d at 341.
Unlike State ex rel. R.T., the defendant in the instant case did not appear to be speaking hypothetically. Also, in the instant case, Ms. Lamotte immediately called her supervisor to report the threats because she was concerned the situation could be dangerous, whereas in State ex rel. R.T., C.M. did not take any actions based on what defendant said, such as immediately notifying the teacher, principal or her parents or not attending class with defendant.
After considering the evidence presented, we find that the evidence was sufficient under the Jackson standard to show that defendant intentionally communicated information to Mr. Avila and Ms. Lamotte that the commission of a crime of violence was imminent, or that a circumstance dangerous to human life was about to exist.
11 (¡General or specific intent
The first issue for this section of the analysis is whether the terrorizing statute requires specific or general intent.
Criminal intent may be specific or general. LSA-R.S. 14:10. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. LSA-R.S. 14:10(2).
The relevant portion of LSA-R.S. 14:40.1 does not state what level of intent must be proved. The Louisiana Supreme Court has recognized that in the absence of qualifying provisions, the term “intent” refers to “general criminal intent.” LSA-R.S. 14:11; State ex rel. R.T., 00-0205 at 11, 781 So.2d at 1246. Nevertheless, the supreme court has also found that specific intent is required where the statutory definition of the crime includes the intent to accomplish a particular consequence.
In State ex rel. R.T., the Second Circuit stated that the terrorizing statute was recognized by the Fourth Circuit in State v. McKeel, 443 So.2d 753 (La.App. 4 Cir. 1983), writ granted by State v. McKeel, 445 So.2d 431 (La.1984), affirmed in part, amended in part by State v. McKeel, 452 So.2d 1171 (La.1984), as defining a very similar crime to that addressed under LSA-R.S. 14:54.1 A, communication of false information of planned arson.[4] State ex rel. R.T., 748 So.2d at 1262. In State ex rel. R.T., the juvenile argued that an adjudication for a violation of LSA-R.S. 14:54.1 A could not be sustained unless two additional elements were read into the statute: that the person who made the threat must have specific actual subjective *985 intent to cause fear, and that the person to whom the threat was conveyed must actually feel threatened. State ex rel. R.T., 00-0205 at 9, 781 So.2d at 1245. The Louisiana Supreme Court declined defendant’s invitation to embellish upon the statute, finding that the statute itself did not make specific intent by the defendant an element of the crime. Id., 00-0205 at 11, 781 So.2d at 1246. The supreme court noted that it had held that specific intent was required where the statutory definition of the crime included the intent to accomplish a particular consequence. Id., 00-0205 at 11, 781 So.2d at 1246, fn. 10. It further noted that the statute [LSA-R.S. 14:54.1] did not refer to the accomplishment of a consequence, and it defined the crime as the act of communication of false information concerning, inter alia, bomb threats, without reference to the consequences of the communication. Id.
Unlike LSA-R.S. 14:54.1 (the communication of false information of planned arson), it appears that LSA-R.S. 14:40.1 (terrorizing) requires specific intent, because the statutory definition of the crime of terrorizing includes the intent to accomplish a particular consequence, i.e., the intent to cause members of the general public to be in sustained fear for their safety, or to cause evacuation of a public building, a public structure, or a facility of transportation, or to cause other serious disruption to the general public.[5] State ex rel. R.T., 00-0205 at 11, 781 So.2d at 1246, fn. 10. This conclusion is supported by State ex reí. R.T., where the 118Louisiana Supreme Court indicated that the terrorizing statute made the crime dependent on causing actual fear or creating a condition of public disruption.[6] It is also supported by State ex rel. J.S., 00-2514 (LaApp. 1 Cir. 2/16/01), 808 So.2d 459, where the First Circuit reversed the terrorizing adjudication after finding that there was no evidence that the writing in that case caused any sustained fear or serious disruption.
Considering the foregoing, we find that LSA-R.S. 14:40.1 requires specific intent, because the statutory definition of the crime includes the intent to accomplish a particular consequence.

Specific intent

The next issue is whether the evidence was sufficient under the Jackson standard to show that defendant had the specific intent to commit the offense of terrorizing.
Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. State v. Young, 05-702, p. 6 (La.App. 5 Cir. 2/14/06); 938 So.2d 90, 95. The factfinder may draw reasonable inferences to support these contentions based upon the evidence presented at trial. Id.
After review of the record, we find that the evidence was sufficient under the Jackson standard to show that defendant had the specific intent to cause members of the general public to be in sustained fear for their safety. LSA-R.S. 14:40.1. The evidence indicates that Ms. Lamotte *986 felt fear, alarm, or agitation of danger, based on the fact that she immediately contacted her supervisor after defendant’s call since she was told to do so if she thought the threats could be dangerous. The evidence also indicates that that fear or alarm was sustained or kept in existence,^J^since Ms. Lamotte’s supervisor apparently alerted other Sony personnel of defendant’s threats.
We also find that the evidence was sufficient under the Jackson standard to show that defendant had the specific intent to cause the evacuation of a building and a serious disruption to the general public. LSA-R.S. 14:40.1. Defendant told Ms. La-motte three or four times that he was going to blow up the building. He told Mr. Avila that he dealt with bombs, and the evidence showed that defendant knew where the Laredo facility was located since he had shipped packages there four previous times and threatened to go there with a gun. Additionally, his threats ultimately led to the evacuation of the Laredo facility.
Additionally, we find that the Sony personnel who worked at the Laredo, Texas facility were members of the general public. Unlike Jason, where the threats were primarily directed to one individual whom defendant may have harbored a grudge against, the threats in the instant case were apparently directed at the Sony employees as a whole at the Laredo, Texas facility.
Although defendant testified that he did not make the threatening statements in question, and he did not intend to frighten any employees or cause an evacuation, the jury obviously found the State’s witnesses more credible. Where there is conflicting testimony, the determination of fact rests solely with the judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. State v. Cazenave, 00-183, p. 14 (La.App. 5 Cir. 10/31/00); 772 So.2d 854, 860, writ denied, 00-3297 (La.10/26/01), 799 So.2d 1151. It is not the function of the appellate court to assess the credibility of witnesses or to reweigh the evidence. State v. Benoit, 04-436, p. 8 (La.App. 5 Cir. 9/28/04); 885 So.2d 625, 630.
In light of the foregoing reasons, we find that a rational trier of fact could have found that the evidence was sufficient under the Jackson standard to support 12nthe conviction. Therefore, we find that the defendant’s conviction was based upon sufficient evidence of guilt.

Assignment of Error Number Two

Defendant argues that the near maximum 12-year sentence is unconstitutionally excessive because it “shocks the conscience” and is grossly inappropriate to the nature of this offense and the character of this offender. He notes that there was no evidence that he had any criminal intent, that he caused a panic in the general public, that he communicated an “imminent” threat to provoke the evacuation, or that anyone was harmed by his action. He further notes that there was no indication that he ever used a gun (other than a BB gun that was never fired) or a bomb, even though threatening to do so. He asserts that a search of his home and car produced no guns and no bomb-making materials. He also argues that the sentence was imposed without any articulated basis pursuant to LSA-C.Cr.P. art. 894.1.
The State responds that the trial judge considered the pre-sentence investigation before sentencing defendant, and that she was aware of his previous criminal history. The State further responds that the trial judge did not abuse her discretion in sentencing, given defendant’s record of convictions and violent behavior.
*987 At the sentencing hearing, the trial judge said that she had reviewed the presentence investigation, and that considering the jury’s guilty verdict, she was sentencing defendant to 12 years at hard labor. Defense counsel noted his objection to the sentence as excessive and informed the trial judge he would be appealing the conviction and sentence.
Defendant did not file a motion to reconsider sentence pursuant to LSA-C.Cr.P. art. 881.1. The failure to file a motion to reconsider sentence, or to state |^specific grounds upon which the motion is based, limits a defendant to a review of his sentence for constitutional excessiveness only. State v. Stevenson, 05-52, p. 11 (La.App. 5 Cir. 6/28/05); 908 So.2d 48, 55, writ denied, 05-2592 (La.6/2/06), 929 So.2d 1247. Additionally, since defendant did not raise the issue of the trial judge’s failure to comply with LSA-C.Cr.P. art. 894.1 in the trial court or in his motion to reconsider sentence, he is precluded from raising this issue on appeal. State v. Hawkins, 06-739, p. 22 (La.App. 5 Cir. 9/25/07); 968 So.2d 1082, 1095, writ denied, 07-2272 (La.4/18/08); 978 So.2d 347.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Smith, 01-2574, p. 6 (La.1/14/03); 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. Id. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lawson, 04-334, p. 6 (La.App. 5 Cir. 9/28/04); 885 So.2d 618, 622.
A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67, p. 5 (La.App. 5 Cir. 5/29/07); 960 So.2d 1127, 1130. The appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Pearson, 07-332, p. 15 (La.App. 5 Cir. 12/27/07); 975 So.2d 646, 656. In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the | ^sentence imposed for similar crimes by the same court and other courts. Id., 07-332 at 15-16, 975 So.2d at 656.
At the time the offenses in the instant ease were committed in May of 2007, LSA-R.S. 14:40.1 B provided that whoever commits the offense of terrorizing shall be fined not more than $15,000.00 or imprisoned with or without hard labor for not more than 15 years, or both. The trial judge sentenced defendant to imprisonment at hard labor for 12 years, which was 80 percent of the maximum, and she did not impose a fine.
We do not find that defendant’s 12-year hard labor sentence was excessive. The defendant in the instant case has an extensive criminal history, including a conviction for theft in 1980, a conviction for simple battery (reduced from aggravated oral sexual battery) in 1997, a (misdemean- or) conviction for resisting an officer in 2002, and a (misdemeanor) conviction for threatening a public official in 2005.[7] As *988 the State noted in its brief, two of those convictions (simple battery and resisting an officer) involved contact with other persons. The presentence investigation report shows that defendant also had previous arrests for aggravated assault, illegal carrying of weapons, battery of a police officer, and battery of a police officer with injury. Also, defendant told Ms. Lamotte, the Sony customer service representative, that he had previously gone to the airport with a BB gun and a knife and that it took numerous police officers to hold him down. At trial, defendant did not admit to the details of the incident, but defendant’s brother did not dispute it during his trial testimony.
Additionally, defendant’s threats in the instant case ultimately led to the evacuation of Sony’s Laredo, Texas repair facility where 150 people were Unemployed, and the evacuation cost approximately $6,000.00. At trial, defendant denied making threats, even though the evidence overwhelmingly showed he made them. Further, the arresting officer testified that defendant admitted to making the threats, and that it appeared to him that defendant would follow through with his threats if given the opportunity. Finally, the 12-year sentence was less than the 15-year maximum and no fine was imposed. Therefore, we do not find that the sentence imposed on defendant is constitutionally excessive.

Assignment of Error Number Three

Defendant argues that his counsel was ineffective for failing to file a motion to reconsider sentence pursuant to LSA-C.Cr.P. art. 881.1. He contends that the failure of his counsel to file the motion precludes him from challenging the trial judge’s failure to articulate a basis for her sentencing choice and the inequality of the sentences as compared with those for other similarly situated defendants, i.e., issues related to statutory excessiveness. The State responds that there has been no showing that a motion to reconsider would have resulted in a different sentence, given defendant’s history and violent behavior.
A criminal defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution. To prove ineffective assistance of counsel, a defendant must show both that (1) his attorney’s performance was deficient, and (2) the deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); State v. Soler, 93-1042, p. 9 (La.App. 5 Cir. 4/26/94); 636 So.2d 1069, 1075, writs denied, 94-0475 (La.4/4/94); 637 So.2d 450 and 94-1361 (La.11/4/94), 644 So.2d 1055. An error is considered prejudicial if it was so serious as to deprive the defendant of a fair trial, or “a trial whose result is reliable.” Strickland v. Washington, 466 U.S. at 687, 104 S.Ct. at 2064; State v. Serio, 94-131, p. 4 (La.App. 5 Cir. 6/30/94), 641 So.2d 604, 607, writ denied, 94-2025 (La.12/16/94), 648 So.2d 388. To prove prejudice, the defendant must demonstrate that, but for counsel’s unprofessional conduct, the outcome of the trial would have been different. Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068.
Generally, an ineffective assistance of counsel claim is best addressed through an application for post-conviction relief filed in the trial court where a full evidentiary hearing can be conducted. However, when the record contains suffi- *989 dent evidence to rule on the merits of the claim and the issue is properly raised by an assignment of error on appeal, it may be addressed in the interest of judicial economy. State v. Taylor, 04-346, p. 10 (La.App. 5 Cir. 10/26/04); 887 So.2d 589, 595. The appellate record is adequate for this Court to address defendant’s claims.
Generally, the defendant’s failure to make a specific objection at the time of sentencing or to file a written motion to reconsider precludes review of a sentence on appeal. State v. Fisher, 03-326, p. 16 (La.App. 5 Cir. 7/29/03); 852 So.2d 1075, 1084, writ denied, 03-2545 (La.5/14/04); 872 So.2d 510. However, this Court routinely reviews sentences for constitutional excessiveness in the absence of defendant’s timely objection or the filing of a motion to reconsider the sentence. Therefore, trial counsel’s failure, in this case, to file a motion to reconsider the sentence did not prejudice defendant by denying him such review.
Further, the mere failure to file a motion to reconsider sentence does not in and of itself constitute ineffective assistance of counsel. State v. Fairley, 02-168, p. 7 (La.App. 5 Cir. 6/26/02); 822 So.2d 812, 816. A defendant must also “show a reasonable probability that, but for counsel’s error, his sentence would have been different.” Id.
12f,In a case similar to the instant one, State v. Armstead, 07-741, p. 10 (La.App. 5 Cir. 2/6/08); 980 So.2d 20, 26, writ denied, 08-0601 (La.10/3/08); 992 So.2d 1010, defendant contended that his sentence was excessive and asserted that the trial judge did not consider any mitigating factors as provided in LSA-C.Cr.P. art. 894.1. Defendant further contended that his counsel was ineffective because he did not object to the sentence or file a motion to reconsider sentence, depriving defendant of appellate review of his sentence. Id. This Court stated that it routinely reviewed sentences for constitutional exces-siveness in the absence of a defendant’s timely objection or the filing of a motion to reconsider the sentence and, therefore, trial counsel’s failure to object to the sentence did not prejudice the defendant by denying him such review. Id.
Additionally, this Court found that, because defense counsel did not file a motion to reconsider sentence, defendant had lost his right to a review of his argument concerning the trial court’s non-compliance with Article 894.1. Id. However, this Court found that defendant still had to show a reasonable probability that his sentence would have been different but for this error, and that defendant had not met that burden of proof, since there was an adequate factual basis in the record for the sentence imposed. Id., 07-741 at 10-13, 980 So.2d at 26-28.
In the instant case, there is an adequate factual basis provided by the trial judge for the sentence contained in the record, as was more fully discussed in Assignment of Error Number Two. The trial judge’s failure to articulate every circumstance listed in LSA-C.Cr.P. art. 894.1 does not require a remand for resentencing. State v. Sanders, 98-855 (La.App. 5 Cir. 5/19/99), 734 So.2d 1276, 1279, writ denied, 99-1980 (La. 1/7/00), 752 So.2d 175. Based upon the factual basis provided, we find that defendant did not meet his burden of proof showing a reasonable probability that his sentence would have been different if his trial counsel had filed the motion to reconsider sentence. Therefore, we do not find that defendant [ 2f;received ineffective assistance of counsel because of the failure to file a motion to reconsider sentence.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; *990 State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals one error patent.
The transcript shows that the trial judge incorrectly advised defendant that he had “two years from today’s date to appeal the conviction and two years from today’s date to seek postconviction relieve [sic].” The commitment shows that the trial judge properly advised defendant of post-conviction relief delays. The transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
LSA-C.Cr.P. art. 930.8 provides that a defendant has two years from the date the defendant’s conviction and sentence become final in which to apply for post-conviction relief. Because defendant was not correctly advised of the prescriptive period on the trial court level, we are advising defendant by this opinion that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of LSA-C.Cr.P. arts. 914 or 922. State v. Hill, 09-80 (La.App. 5 Cir. 5/26/09), 15 So.3d 1038, 1041.

DECREE

For the foregoing reasons, defendant’s conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.

. Mr. Gutierrez explained that they received units in their facility in Laredo, Texas and then shipped them to the facility in Nuevo Laredo, Mexico, where the units were actually repaired. He further explained that the two facilities were only eight miles apart, but in two different countries.

. It is noted that, in the bill of information, the State alleged that defendant communicated information that the commission of a crime of violence was imminent or in progress or that circumstance dangerous to human life did exist or was about to exist, with the intent of causing members of the general public to be in sustained fear for their safety and/or that he caused the evacuation of a building.

. At the time the crime was committed in that case in 1999, the statute required that the information that was communicated was known by the offender to be false. The statute provided:
Terrorizing is the intentional communication of information, known by the offender to be false, that the commission of a crime of violence is imminent or in progress or that a circumstance dangerous to human life exists or is about to exist, thereby causing any person to be in sustained fear for his or another person's safety; causing evacuation of a building, a public structure, or a facility of transportation; or causing other serious disruption to the public.

. LSA-R.S. 14:54.1 A provides: "Communicating of false information of arson or attempted arson is the intentional impartation or conveyance, or causing the impartation or conveyance by the use of the mail, telephone, telegraph, word of mouth, or other means of communication, of any threat or false information knowing the same to be false, including bomb threats or threats involving fake explosive devices, concerning an attempt or alleged attempt being made, or to be made, to commit either aggravated or simple arson.”

. It is noted that there are statutes that require specific intent, even though the term ''specific” is not in the statute, including LSA-R.S. 14:62.2 (simple burglary of an inhabited dwelling) (State v. Davenport, 08-463, p. 7 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 449, writ denied, 09-0158 (La. 10/16/09); 19 So.3d 473); and LSA-R.S. 14:67.10 (theft of goods valued over $500) (State v. Green, 02-883, p. 5 (La.App. 5 Cir. 1/28/03), 839 So.2d 286, 288, writ denied, 03-0848 (La. 10/31/03), 857 So.2d 474).

. "Unlike the crime of terrorizing, with which R.T. was also charged, the wording of this statute [communication of false information of planned arson] does not make the crime depend on causing actual fear or creating a condition of public disruption.” State ex rel. R.T., 00-0205 at 6, 781 So.2d at 1243.

. Defendant admitted the convictions of theft and simple battery at trial; however, the mis *988 demeanor convictions were not mentioned at trial. Those convictions were discovered in the presentence investigation report, which the trial judge said she had read prior to sentencing.